*In re* VICKERS.

1. WITNESSES—SELF INCRIMINATION.

A witness may not be compelled to answer questions which might tend to incriminate such person (Const 1908, art 2, § 16).

2. SAME—SELF INCRIMINATION—CONSTITUTIONAL LAW.

The constitutional privilege against self incrimination excuses a witness from making any answer to a question even though an answer to the question 1 way would not incriminate, if the opposite answer might do so (Const 1908, art 2, § 16).

3. SAME—NONINCRIMINATION ANSWERS.

The constitutional privilege against self incrimination does not excuse the witness from answering a question, where an answer either way would not incriminate, and whether or not it would is a matter for the judge to determine, not the witness (Const 1908, art 2, § 16).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur, Witnesses § 36 *et seq.*
[2] 58 Am Jur, Witnesses §§ 47, 53, 57.
[3, 5] 58 Am Jur, Witnesses §§ 81, 82.
[4] 1 Am Jur 2d, Abortion §§ 10, 11.
[6] 1 Am Jur 2d, Abortion § 11.
  Woman upon whom abortion is committed or attempted as an accomplice. 139 ALR 993.
[7] 14 Am Jur, Criminal Law § 77.

4. CONSPIRACY—ABORTION—INDICTMENT AND INFORMATION.

A charge of conspiracy to commit abortion will not lie against the 2 participants, since abortion involves concert of action between the perpetrator and the victim, the immediate effect of consummation reaching only the participants and conspiracy to commit it is in such close connection with the objective offense as to be inseparable from it.

5. WITNESSES—ABORTION—SELF INCRIMINATION.

Refusal of witness to answer 4 questions, put to her on preliminary examination in a criminal case in which a physician was charged with conspiracy to commit the crime of abortion on pregnant women, as to whether or not she had ever gone to his office, ever gone to his office for professional services, ever gone to his office for purpose of consulting with him about obtaining an abortion on herself, and whether he ever performed an abortion on her, *held*, to constitute a proper basis for holding her guilty of contempt, since the answers thereto would not incriminate her of conspiracy to commit abortion, of abortion, as an accomplice, aider, or abettor, of adultery, lewd and lascivious cohabitation, disorderly conduct, violation of the Federal white slave act, or other conceivable offenses (Const 1908, art 2, § 16; CL 1948, §§ 750.14, 767.39).

6. ABORTION—STATUTES—COMMON LAW.

The statue making it a felony, under certain circumstances, to perform an abortion upon a woman does not provide that the woman herself shall be guilty of an offense, and since at common law she was not guilty of a crime even though she performed the aborting act upon herself or assisted or assented thereto, she may not be held either for abortion or as an accomplice (CL 1948, § 750.14).

7. CRIMINAL LAW—AIDERS AND ABETTORS.

Aiders and abettors to a crime cannot be held as principals if they are outside the statutory designation of the persons who may commit the crime.

Appeal from Macomb; Carroll (Howard R.), J. Submitted May 7, 1963. (Calendar No. 38, Docket No. 49,301.) Decided September 4, 1963.

Habeas corpus by Eileen Pat Vickers directed to the sheriff of Macomb county challenging confinement in county jail by Francis A. Castellucci, justice

of the peace, for contempt of court for refusal to answer questions during preliminary hearing in a conspiracy case. Writ dismissed. Plaintiff appeals. Affirmed.

*John J. Goetz,* for plaintiff.

*George N. Parris,* Prosecuting Attorney, and *Tony Ferris,* Assistant Prosecuting Attorney, for the people.

Dethmers, J. This is an appeal from a circuit court order dismissing the writ of habeas corpus issued to inquire into the legality of petitioner's commitment to county jail by a justice of the peace for contempt for refusal to answer certain questions put to her as a people's witness at a preliminary examination in a criminal case in which Dr. Emery J. Gilbert and others, not including petitioner, were charged with conspiracy to commit the crime of abortion on pregnant women.

The questions put to petitioner were as follows:

"*Q.* Did you ever go to his office?"

"*Q.* Miss Vickers, did you ever go to Dr. Gilbert's office for the purpose of professional services, from Dr. Gilbert?"

"*Q.* Now witness, isn't it a fact that you went to Dr. Gilbert's office for the purpose of consulting with him about obtaining an abortion on yourself?"

"*Q.* Didn't Dr. Gilbert perform an abortion on you?"

She refused to answer on the ground that "it might incriminate me". For such refusal the justice of the peace found her guilty of contempt of court, committed in open court in the presence of the judge thereof, and ordered her confined in the county jail

until she shall purge herself of such contempt by answering said questions.

If answers to the questions might tend to incriminate petitioner, she could not lawfully be required to answer under Michigan Constitution of 1908, art 2, § 16, which provides "no person shall be compelled in any criminal case to be a witness against himself." Even though an answer to a question 1 way would not incriminate, if the opposite answer might, the constitutional privilege excuses the witness from making any answer thereto. *In re Allison,* 156 Mich 34, and cases cited therein. If an answer either way to the questions would not incriminate her, she may be compelled to answer. Of that the court, not the witness, is the judge. *In re Moser,* 138 Mich 302 (5 Ann Cas 31); *In re Mark,* 146 Mich 714; *People, ex rel. Moll,* v. *Danziger,* 238 Mich 39 (52 ALR 136); 1 Burr's Trial 244.

Abortion involves concert of action between 2 persons, the perpetrator and the victim, the immediate effect of consummation reaching only the participants, as also in respect to adultery, bigamy, incest, or dueling, in which a charge of conspiracy to commit the offense will not lie against the 2 participants. This is because the conspiracy to commit them is in such close connection with the objective offense as to be inseparable from them. *Curtis* v. *United States* (CCA 10), 67 F2d 943; *Lisansky* v. *United States* (CCA 4), 31 F2d 846 (67 ALR 67). See, also: *United States* v. *Katz,* 271 US 354 (46 S Ct 513; 70 L ed 986); *Gebardi* v. *United States,* 287 US 112 (53 S Ct 35; 77 L ed 206, 84 ALR 370). Hence, petitioner's answers would not incriminate her of conspiracy to commit abortion.

Could she be charged with abortion? CL 1948, § 750.14 (Stat Ann § 28.204), declares one guilty of a felony who, under certain circumstances, performs an abortion upon a woman. It does not provide that

the woman herself shall be guilty of an offense. At common law she was not guilty of a crime even though she performed the aborting act upon herself or assisted or assented thereto. *State* v. *Carey,* 76 Conn 342 (56 A 632). The majority view is that not only may she not be held for abortion upon herself but neither as an accomplice. See annotations at 139 ALR 993 *et seq.*

CL 1948, § 767.39 (Stat Ann § 28.979), provides that one who procures, counsels, aids, or abets the commission of an offense may be tried, convicted, and punished as if he had directly committed the offense. In *People* v. *Meisner,* 178 Mich 115, this Court said:

> "Where an offense can be committed only by a specified class, aiders and abettors cannot be charged as principals if they are outside the statute designation."

Inasmuch, then, as petitioner cannot be held for commission of the crime of abortion upon herself, she may not be held as an aider or abettor thereof.

It is suggested in petitioner's brief that answers by petitioner to the stated questions might tend to incriminate her of adultery, lewd and lascivious cohabitation, disorderly conduct, violation of the Federal white slave act* or other offenses. How this could be is not spelled out. In the case of *In re Schnitzer,* 295 Mich 736, 740, 741, this Court said:

> "The Constitution does not permit the witness 'to arbitrarily hide behind a fancied or intangible danger' (*In re Moser, supra*). The tendency to incriminate must be a reasonable one; an answer may not be withheld because it might possibly under some conceivable circumstances form part of a crime. 8 Wigmore on Evidence (3d ed), p 354, § 2260. * * *

---

* 18 USC (1958 ed), § 2421.—Reporter.

In *Ex parte Irvine* (SD Ohio), 74 F 954, 960, Judge Taft wrote:

" 'It is impossible to conceive of a question which might not elicit a fact useful as a link in proving some supposable crime against a witness. The mere statement of his name or of his place of residence might identify him as a felon, but it is not enough that the answer to the question may furnish evidence out of the witness' mouth of a fact which, upon some imaginary hypothesis, would be the 1 link wanting in the chain of proof against him of a crime. It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime.' "

We hold that the answers would not tend to incriminate her of those or any other conceivable offenses.

Affirmed.

CARR, C. J., and KELLY, BLACK, KAVANAGH, SMITH, and O'HARA, JJ., concurred with DETHMERS, J.

SOURIS, J. (*concurring*). While I can agree with Justice DETHMERS' conclusion, and the reasoning by which he reaches that conclusion, that petitioner was not entitled to assert her State constitutional privilege (Michigan Constitution of 1908, art 2, § 16) to refuse answers to the last 3 of the questions asked,[1] I believe she was entitled to invoke the privilege in refusing to answer the first question, unlimited in its scope, and would be entitled to invoke

---

[1] "*Q.* Did you ever go to his office?"

"*Q.* Miss Vickers, did you ever go to Dr. Gilbert's office for the purpose of professional services, from Dr. Gilbert?"

"*Q.* Now witness, isn't it a fact that you went to Dr. Gilbert's office for the purpose of consulting with him about obtaining an abortion on yourself?"

"*Q.* Didn't Dr. Gilbert perform an abortion on you?"

it to refuse to answer further inquiry any broader than necessary to ascertain whether Dr. Gilbert performed an abortion upon petitioner and, if so, the facts involved in that specific event. My reason for so rigidly limiting the scope of inquiry of this witness is that, if Gilbert in fact performed an abortion upon her, once the facts relating only thereto are known, petitioner is entitled to assert the same constitutional privilege upon further inquiry about her associations with Gilbert, if any, that any other witness would be entitled to assert.

Absent supreme command to apply the Fifth Amendment to the Constitution of the United States to State cases such as this and confronted by a still binding command to the contrary, *Adamson* v. *California,* 332 US 46 (67 S Ct 1672, 91 L ed 1903, 171 ALR 1223), we need only regard Fifth Amendment Federal court cases as sources of guidance[2] in formulating the shape and substance of our own identically worded State constitutional guarantee. For me, however, they are highly persuasive, believing as I do that uniformity of construction in such cases is much to be desired. I turn, therefore, to Federal cases to determine the bounds beyond which petitioner may not be compelled to testify without risking self incrimination as an abortionist upon others, an aider and abettor therein, or a member of a conspiracy to commit abortion upon others.

I begin with *Ex parte Irvine* (SD Ohio, 1896), 74 F 954, quoted with approval by this Court in *In re Schnitzer,* 295 Mich 736, which in turn is relied upon by Justice DETHMERS, for the proposition that to uphold invocation of the privilege against self incrimi-

---

[2] As we did in the case of *In re Schnitzer,* 295 Mich 736, by adopting Judge Taft's "tangible and substantial probability" test announced in *Ex parte Irvine* (SD Ohio, 1896), 74 F 954, quoted in Justice DETHMERS' opinion.

nation, "it must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime." (p 960) It should be noted that in the *Irvine Case,* Judge Taft reversed Irvine's and his copetitioner's contempt convictions. There had been earlier testimony at the trial in which petitioners were called as witnesses that petitioners had visited the headquarters of alleged policy writers. When questioned, petitioners refused to say whether certain individuals were policy writers. Taft held that Irvine's admission as to his knowledge of the individuals' occupations would be evidence to establish the fact that those individuals were policy writers, which fact would be a material link in the chain of evidence to establish Irvine's guilt "on a charge of conspiracy". In a like manner Vickers' admission of associations with Dr. Gilbert, apart from such as may have occurred during an abortion upon her, could be a link in a chain leading to her own conviction for abortion, aiding therein or conspiracy to commit abortion, upon others. Judge Taft's practical application of his "tangible and substantial probability" test, as evidenced by his actual disposition of the *Irvine Case,* does not negate assertion of our identical State privilege by Vickers.

In more recent cases, moreover, the supreme court has indicated a relaxation of the "tangible and substantial probability" test enunciated by Judge Taft. In *Hoffman* v. *United States* (1950), 341 US 479 (71 S Ct 814, 95 L ed 1118), the supreme court reversed the contempt conviction of a witness who, before a Federal grand jury, had refused to answer questions such as "When did you last see A?"; "Did you see A last week?"; "Have you talked with A on the telephone?" The Court noted that witness' answers

might have connected him with A when A was eluding the grand jury and, therefore, that witness might "reasonably have sensed the peril of prosecution for Federal offenses ranging from obstruction to conspiracy" (p 488). The Court then stated: "In this setting it was not *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate," citing *Temple* v. *Commonwealth* (1881), 75 Va 892, 898. At pages 486, 487, the court added: "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." As *Hoffman* shows, the supreme court is responsive to the possibility of compelling a witness to incriminate himself in a charge of conspiracy.

In *Blau* v. *United States* (1950), 340 US 159 (71 S Ct 223, 95 L ed 170), the supreme court reversed petitioner's conviction for contempt by refusing to answer grand jury questions regarding her association with Communist party members and her knowledge of the organizational structure of the party. "Answers * * * would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith act[3]." (p 161)

In *Emspak* v. *United States* (1955), 349 US 190 (75 S Ct 687, 99 L ed 997), petitioner refused to answer questions relating to his alleged associations with Communists. Reversing a contempt conviction, the supreme court held: "To reveal knowledge about the named individuals—all of them having been previously charged with Communist affiliations—

---

[3] 18 USC (1958 ed), § 2385.—Reporter.

could well have furnished 'a link in the chain' of evidence needed to prosecute petitioner for a Federal crime, ranging from conspiracy to violate the Smith act * * *" (p 200). And later (p 201): "That being so, it is immaterial that some of the questions sought information about associations that petitioner might have been able to explain on some innocent basis unrelated to Communism. If an answer to a question may tend to be incriminatory, a witness is not deprived of the protection of the privilege merely because the witness if subsequently prosecuted could perhaps refute any inference of guilt arising from the answer."

In footnote 18, at p 198, the Court cited with approval the language used in *United States* v. *Coffey* (CCA 3, 1952), 198 F2d 438, 440, to express the test for determining whether the privilege was legitimately invoked: " 'It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in the circumstances of the particular case.' " The third circuit court promulgated this test after its noteworthy experience in *United States* v. *Greenberg* (CCA 3, 1951), 187 F2d 35, wherein it affirmed the contempt conviction of a witness who refused to testify before a grand jury[4] regarding the business in which he was engaged and his acquaintance with certain numbers runners. On its first appeal, the supreme court remanded the case for consideration in light of its decision in *Hoffman*. *Greenberg* v. *United States* (1951), 341 US 944 (71 S Ct 1013, 95 L ed 1369). Upon appeal again from the third circuit's reaffirmance of its prior judgment,

[4] The same grand jury before which Hoffman was called for testimony. *Hoffman* v. *United States, supra.*

192 F2d 201, the supreme court reversed without opinion, merely citing *Hoffman*. *Greenberg* v. *United States* (1952), 343 US 918 (72 S Ct 674, 96 L ed 1332). In the *Emspak* opinion the Court observed that the courts of appeals were even then apparently uniform in holding that the privilege extended to questions of the sort involved in *Emspak, i.e.,* questions with regard to an individual's associations. See such cases cited at footnote 24, *Emspak* v. *United States,* 349 US 190, at 201.

For a time it might have been argued that cases like *Hoffman* were distinguishable from Vickers in that they involved persons who had achieved a certain notoriety and, so, any associational admissions by such persons were more likely to be incriminating than would such admissions by reputable citizens. Note that the supreme court in *Hoffman* (p 489) commented that Hoffman had been mentioned often in the newspapers as a prominent racketeer with a long police record; in *Emspak* it commented, in a like manner, that petitioner had been named as a Communist in a Smith act trial in 1949. Thus, in *United States* v. *Trock* (CCA 2, 1956), 232 F2d 839, where a witness refused to answer grand jury questions with regard to his associations, the circuit court upheld his resulting contempt conviction, distinguishing *Hoffman* (p 843) in that petitioner here was not a notorious criminal or racketeer nor was anyone else whose name was mentioned in the hearings before the district court. However, Judge Medina dissented on the ground (p 846) that petitioner might turn out to have participated, in some direct or remote way, in an illegal scheme involving some of the individuals in question, and any information provided by answers to any of the questions might complete or lead to the completion of the chain of proof against him. The supreme court reversed without opinion, citing *Hoffman*. *Trock* v. *United*

*States* (1956), 351 US 976 (76 S Ct 1048, 100 L ed 1493). See, also, Judge Lumbard's dissenting opinion in *United States* v. *Courtney* (CCA 2, 1956), 236 F2d 921. It is no longer tenable to claim that the *Hoffman* and *Emspak* tests are confined only to instances where the claimant is publicly notorious or directly involved in matters under investigation.

A Federal case quite closely analogous to the Vickers case is *Hitson* v. *United States* (ND Cal, 1959), 177 F Supp 834. Before a grand jury investigating Mann act[5] violations, a witness refused to answer questions such as, "Have you ever engaged in prostitution?" and questions asking her to name individuals who had provided her with transportation. The district judge, purportedly adopting and applying the test suggested by the third circuit in the *Coffey Case, supra,* and approved by the supreme court in *Emspak,* convicted the witness of contempt, since there (p 843) "is no reasonable probability that the witness would have, or could have incriminated herself under any Federal law" had she answered the questions. The circuit court reversed, *sub nom., In re Shane* (CCA 9, 1960), 283 F2d 355, stating that the questions asked might lead (p 357) "to a showing that [witness] had been a party to the transportation of some other woman (or a conspiracy) in interstate commerce in violation of the Mann act." Under the Mann act the woman being transported is immune from prosecution, just as the participant in an abortion is immune from prosecution, as Justice Dethmers notes in this case; nonetheless, the circuit court of appeals recognized that there still existed the possibility that the woman might be liable to conviction for conspiring to transport other women for purposes proscribed by the Mann act.

---

[5] 18 USC (1958 ed), § 2421.—Reporter.

Although it has been principally during the last 20 years or so that the Federal courts have formulated the presently recognized scope of the protection afforded by the Fifth Amendment, the concepts expressed in the Federal cases discussed above are not new. In *Counselman* v. *Hitchcock* (1892), 142 US 547, 585 (12 S Ct 195, 35 L ed 1110), the supreme court said: "It is a reasonable construction, we think, of the constitutional provision, that the witness is protected 'from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his connection, without using his answers as direct admissions against him' ". Nothing less is due Miss Vickers, clothed as she is by the mantle of testimonial immunity granted her by the counterpart provision of our State Constitution.

Subject to the foregoing limitations, I concur in affirmance.