PEOPLE v NIXON

OPINION OF THE COURT

1. ABORTION—STATUTES—LEGISLATIVE INTENT.

The intent of the abortion statute first enacted by the Michigan Legislature in 1846 was to protect the pregnant woman, not to protect the rights of the unquickened fetus (MCLA 750.14).

2. ABORTION—STATE INTEREST—MEDICAL TREATMENT.

The interest of the state in protecting pregnant women from the dangers of abortion no longer exists since modern medical science has made a therapeutic abortion reasonably safe where performed by a licensed physician, in a clinical setting, during the first trimester of pregnancy; any state interest that does exist is counterbalanced by the superior right of a woman and her physician to undertake such medical treatment as is deemed appropriate.

3. ABORTION—THERAPEUTIC ABORTION—DISCRETION OF PHYSICIAN.

The question of whether a woman should be given a therapeutic abortion during the first trimester is a question which is properly addressed to the discretion of the physician in the exercise of his professional duties.

4. ABORTION—STATUTES—PHYSICIANS AND SURGEONS.

A licensed physician who performs a therapeutic abortion upon a woman who is in her first trimester of pregnancy, if such operation takes place in a hospital, is not subject to prosecution under the statute punishing abortion (MCLA 750.14).

REFERENCES FOR POINTS IN HEADNOTES
[1] 1 Am Jur 2d, Abortion § 9.
[2–5] 1 Am Jur 2d, Abortion §§ 9, 18, 20.
[6, 7] 1 Am Jur 2d, Abortion § 19 et seq.
[8] 16 Am Jur 2d, Constitutional Law § 177 et seq.
[9] 16 Am Jur 2d, Constitutional Law § 60 et seq.
[10] (no reference).
[11] (no reference).

5. ABORTION—PHYSICIANS AND SURGEONS—CONSULTATION—STANDARD OF CARE.

> A physician who performs an abortion on a woman with little or no consultation as to the state of her health, either mental or physical, and in a manner which was improper and conducive to inducing an infection, may not use his professional status as a shield and may be charged with and convicted of illegal abortion (MCLA 750.14).

6. ABORTION—NECESSITY—BURDEN OF PROOF—CONSTITUTIONAL LAW.

> The last sentence of the criminal statute punishing abortion is clearly unconstitutional in that it impermissibly shifts the burden of proof of necessity of the abortion to the defendant; the prosecution must prove the lack of necessity in every abortion prosecution (MCLA 750.14).

7. ABORTION—NECESSITY—BURDEN OF PROOF—EVIDENCE.

> The prosecution must prove the lack of necessity in every abortion prosecution, and where the record clearly indicates that the woman, upon whom the abortion was performed was in good health at the time, and that the abortion was obtained only because she was unmarried and unwilling to get married or have the child out of wedlock, the prosecution has sustained its burden of proof.

DISSENT IN PART BY T. M. BURNS, J.

8. CONSTITUTIONAL LAW—INVALID ACT—SPECIFIC CLAUSE.

> *A court, in declaring an act unconstitutional, must specify the exact clause of the constitution which is violated.*

9. CONSTITUTIONAL LAW—STATUTES—INVALIDITY.

> *The doctrine of cessante ratione legis, cessat et ipsa lex (the reason of the law ceasing, the law itself also ceases), has never been accepted in Michigan; it is a rule of stare decisis, having no application to statutory law, and cannot be used as a vehicle by which the Court of Appeals may invalidate a statute.*

10. ABORTION—STATUTES—LEGISLATIVE INTENT.

> *The Legislature, in enacting the statute prohibiting abortion in 1846, was not prompted solely by solicitude for the health and safety of pregnant women; rather, the underlying reasons were moral, ethical, philosophical, and theological in nature (MCLA 750.14).*

11. ABORTION—STATUTES—LEGISLATIVE INTENT.

> *Considering the maelstrom of controversy in which the abortion issue is now immersed, it cannot be said that the reasons for the original enactment of the law in 1846, which were primarily, if not wholly, moral, ethical, theological, and philosophical, no longer exist (MCLA 750.14).*

Appeal from Bay, John X. Theiler, J. Submitted Division 2 February 3, 1972, at Lansing. (Docket No. 9579.) Decided August 23, 1972. Leave to appeal granted, 388 Mich 788.

Robert S. Nixon was convicted of illegal abortion. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Eugene C. Penzien,* Prosecuting Attorney, for the people.

*James G. Orford,* for defendant on appeal.

Before: DANHOF, P. J., and T. M. BURNS and VAN VALKENBURG,* JJ.

VAN VALKENBURG, J. Robert Nixon, a licensed physician, was found guilty by a jury of the felony of abortion contrary to MCLA 750.14; MSA 28.204.[1] Defendant Nixon argues on appeal, as he did before the trial court, that the Michigan abortion statute is unconstitutional because it is vague in the constitutional sense, and because it places

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA 750.14; MSA 28.204 provides:

"Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

"In any prosecution under this section, it shall not be necessary for the prosecution to prove that no such necessity existed."

an undue restraint upon a physician in the dis-
charge of his professional duties. Before we under-
take to discuss the merits of these issues, we feel it
is incumbent upon us to discuss the nature and
intent of the Michigan statute.

A very brief history of the common-law position
with regard to induced abortions is necessary in
order to understand the nature and intent of the
Michigan abortion statute. At common law an
induced abortion[2] of an unquickened[3] fetus did not
constitute a crime.[4] Against this backdrop of the
common law, the Michigan Legislature in 1846
enacted three provisions relating to the well-being
of a pregnant woman and her unborn child. The
first of these provisions provided that wilful killing
of an unborn quick child by injury to the mother
was manslaughter.[5] The second provided that any-
one who administered any medicine or drug or
used any instrument or other means upon a
woman pregnant with a quick child, with the
intent to destroy such child, unless the same was

[2] The term "abortion" by itself does not connote that the expulsion
of the fetus is either the product of a criminal act or that it was
induced by an artificial means. At least for the purposes of a legal
discussion the terms "abortion" and "miscarriage" may be considered
synonymous. See *Gilchrist v Mystic Workers of the World,* 196 Mich
247 (1917).

[3] The terms "quickened" and "unquickened" relate to the temporal
relationship with regards to intrauteral development of the fetus.
Quickening is that point when the fetus indicates signs of life by way
of fetal movements which can be felt by the mother. These move-
ments are usually first noted in the fourth or fifth month of preg-
nancy. Stedman, Medical Dictionary (21st ed), p 1340.

[4] See Sikora, *Abortion: An Environmental Convenience or a Consti-
tutional Right,* 1 Environmental Affairs 469, 473 and the authorities
cited in footnote 35 of said article. See, also, *People v Belous,* 71 Cal
2d 954, 961; 80 Cal Rptr 354, 358; 458 P2d 194, 198 (1969).

[5] 1846 RS, ch 153, § 32, which provided:
"The wilful killing of an unborn quick child by any injury to the
mother of such child, which would be murder if it resulted in the
death of such mother, shall be deemed manslaughter."
See, also, MCLA 750.322; MSA 28.554.

necessary to preserve the life of the mother, would be guilty of manslaughter if either the child or mother died.[6] The third provision, the precursor to the statute considered herein, provided that anyone who wilfully administered any drug or substance or used any instrument upon a pregnant woman with the intent to procure a miscarriage, unless the same was necessary to preserve the life of the mother, was guilty of a misdemeanor.[7]

Authored as they were in 1846, and in light of the fact that the death of a quickened fetus by an induced abortion was deemed manslaughter whereas a mere abortion was a misdemeanor, it is immediately apparent that the Legislature intended to retain the common-law distinction between a quickened and unquickened fetus. Since the destruction of an unquickened fetus by means of an induced abortion was made a misdemeanor, but the destruction of a quickened fetus was manslaughter, it is apparent that the Legislature did not view the induced abortion of an unquickened fetus as being the destruction of a human life. In

---

[6] 1846 RS, ch 153, § 33, which provided:

"Every person who shall administer to any woman pregnant with a quick child, any medicine, drug or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case the death of such child or of such mother be thereby produced, be deemed guilty of manslaughter."

See, also, MCLA 750.323; MSA 28.555.

[7] 1846 RS, chap 153, § 34, which provided:

"Every person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent to procure the miscarriage of such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose, shall, upon conviction, be punished by imprisonment in a county jail not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment."

See, also, MCLA 750.14, *supra,* as quoted in footnote 1.

other words, the unquickened fetus was not considered to be a separate human being so as to make the destruction of such fetus a killing.[8] Viewed in this manner, one is forced to the conclusion that the so-called "abortion" statute was not intended to protect the "rights" of the unquickened fetus.[9]

This thus brings us to the crucial question: If the purpose of the statute was not to protect the fetus, what then was its intended purpose? The obvious purpose was to protect the pregnant woman. When one remembers that the passing of the statute predated the advent of antiseptic surgery, the Legislature's wisdom in making criminal any invasion of the woman's person, save when necessary to preserve her life, is unchallengeable. The conclusion that the statute was aimed primarily at the problem of the health and safety of the woman is buttressed by the fact that the statute makes the mere attempt to artificially induce a miscarriage punishable,[10] and by the fact that if

[8] The Court in *People v Olmstead,* 30 Mich 431, 433 (1874), in commenting about the distinction between § 33 (as set forth in footnote 7) and § 34 (as set forth in footnote 8), stated:

"The distinction, therefore, is clearly taken, as depending on the intent to destroy a living unborn child, and supplies a defect at the common law, whereby such attempts were not felonious, and in some cases, at least, may not have been punishable at all.

"The elements of the crime, as applied to the case before us, are found in the death of the mother, produced by acts intended to destroy a quick child; that term being used in the statute as an unborn child liable to be killed by violence. The ambiguity which, according to Mr. Bishop, seems to exist in some statutes, as to the foetal condition, is not found in our statutes, which cover the whole ground by different provisions: *Comp. L., §§ 7541, 7542, 7543; Bishop on Statutory Crimes, §§ 742–750, and cases.*"

[9] The woman cannot be prosecuted under MCLA 750.14, *supra,* for a self-induced abortion. See *In re Vickers,* 371 Mich 114 (1963). Since the woman cannot be prosecuted under that statute, it must be assumed that the harm the statute was attempting to punish ran only to the woman and not to the fetus. If the statute were intended to protect the continued existence of the fetus, then there would be no reason for exempting the woman from prosecution.

[10] The Court in *People v Olmstead, supra,* 432, held that the

death of the woman resulted from such an attempt or completed act, such death was deemed to be manslaughter. While the 1931 revision[11] of the statute to its present form made the crime a felony, made the death of the woman, if it resulted from an abortion, manslaughter[12] and deleted the language regarding the advice of two doctors, we find nothing to indicate that the intent of the Legislature in 1931 was any different than that of the Legislature in 1846.

As noted above, when the precursor of MCLA 750.14, *supra,* was enacted there was a very legitimate and compelling state interest in making criminal all induced abortions or attempts thereof. Even the 1931 revision predates the existence of the multitude of broad-spectrum antibiotics which have substantially reduced the dangers arising from infections. We cannot be unmindful of the pronouncement of the Michigan Supreme Court in *Womack v Buchhorn,* 384 Mich 718, 720 (1971),[13] wherein the Court stated:

"Since *Newman* has been decided, medical science has probably advanced more in one generation than in

precursor to MCLA 750.14 *supra,* "makes all unnecessary attempts to produce the miscarriage of a pregnant woman, whatever may be the result, punishable as a misdemeanor".

[11] 1931 PA 328, § 14.

[12] The manslaughter provision in the 1931 revision was merely a codification of the long-standing rule that when death of the woman resulted from the illegal induced abortion or attempt thereof, the person performing the act was guilty of manslaughter. See, *People v Abbot,* 116 Mich 263 (1898); *People v Stahl,* 234 Mich 569 (1926).

[13] The *Womack* decision is sometimes mistakenly cited for the proposition that the Court recognized the unborn child's "right to live". This is not the case, for as the Court clearly stated: "The only issue in this case is whether a common-law negligence action can be brought on behalf of a *surviving* child negligently injured during the fourth month of pregnancy." (Emphasis supplied.) *Womack, supra,* 719–720. Thus the *Womack* decision would appear to be limited to those cases where there is a live birth. If there is a live birth, then an action may be brought in the name of the child for prenatal injuries.

the previous 100 years or more. Legal philosophy and precedent have moved in response to scientific and popular knowledge."[14]

The question thus confronting us is whether there is a sufficient state interest with regard to the health and safety of the woman to continue to justify application of the present Michigan abortion statute. While we have little difficulty in finding a sufficient state interest with regard to induced abortions performed by non-physicians,[15] the question of whether there is a sufficient state interest to justify continued application of the statute with regard to licensed physicians is somewhat more complex. As noted above, medical science has made tremendous strides in recent years. No longer is an induced abortion, when performed by a licensed physician in an antiseptic environment, a matter of so great a danger that it justifies a blanket denial of the right to secure such medical services. Not only has modern medical science made a therapeutic abortion reasonably safe, but it would now appear that it is safer for a woman to have a hospital therapeutic abortion during the first trimester than to bear a child.[16]

Faced with this evidence we are forced to conclude that the intended purpose of MCLA 750.14, *supra,* is no longer existent as it applies to licensed physicians in a proper medical setting. There is no longer a sufficient state interest to justify continued prosecution of licensed physicians for the mere act of artificially inducing a miscarriage of an unquickened fetus. What state interest there is in

---

[14] The case referred to by the Court is *Newman v Detroit,* 281 Mich 60 (1937).

[15] See *People v Bricker,* 42 Mich App 352 (1972).

[16] See *People v Belous,* 71 Cal 2d 954, 965; 80 Cal Rptr 354, 360–361; 458 P2d 194, 200–201 (1969), and the authorities cited in footnote 7 of that opinion.

the continued protection of the woman is counter-balanced and offset by the superior right of the woman and her physician to undertake such medical treatment as is deemed appropriate.[17] The question of whether any given woman should be given a therapeutic abortion during the first trimester is a question which is properly addressed to the discretion of the physician in the exercise of his professional duties.

Not only has the present Michigan abortion statute become unproductive of the end for which it was originally intended, *i.e.,* the health and safety of the woman, but it would appear that it has become counter-productive. Since *In re Vickers,* 371 Mich 114 (1963), recognized that the woman could not be prosecuted under the present statute for either a self-induced abortion or as an aider and abettor in an abortion performed upon her, the law has, at least to some extent, indicated that the woman has a right to abort. To recognize

[17] There can be no question as to the right of the woman to possess and control her body as she sees fit, in the absence of an expressed compelling state interest, for as the Court stated in *Union Pacific R Co v Botsford,* 141 US 250, 251; 11 S Ct 1000, 1001; 35 L Ed 734, 737 (1891):

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

See, also, *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The Court in *Griswold v Connecticut,* 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965) recognized this right of personal privacy to be constitutionally protected, and, as such, one which could not be encroached upon to any significant extent in the absence of some compelling state interest.

Since the intended state interest sought to be protected by the Michigan "abortion" statute was that of the protection of the woman's health and safety, and in light of the fact that such interest is no longer promoted with regard to therapeutic abortion by a licensed physician, there is no longer a sufficient compelling state interest in the continued application of the statute to licensed physicians to justify infringement upon the woman's protected right to personal control of her person. See, also, *Babbitz v McCann,* 310 F Supp 293, 298–302 (ED Wis, 1970).

the woman's right to abort and simultaneously deny her the right to seek proper medical aid, except where necessary to preserve her life, does not encourage and promote the health and safety of the woman; but rather, it encourages the woman to place herself in the hands of those not properly skilled. Such an anomaly is not only illogical, but also is fatal to the continued application of the statute. See *Beecham v Leahy,* 130 Vt 164; 287 A2d 836 (1972).

While we do not believe that the intended aim of the statute is effectuated by the continued prosecution of licensed physicians who perform abortions in the first trimester of pregnancy in an antiseptic clinical environment, we do not intend to convey the impression that a license to practice medicine leaves a physician free to practice "backroom butchery", any more than can his unlicensed counterpart. While a licensed physician may well be more skillful than one not trained in medicine, if the physician practices that skill in the septic environment of the backroom rather than in an antiseptic clinical environment, that physician, like his less skilled brother, will be amenable to prosecution under MCLA 750.14, *supra.*

Even though we hold that a licensed physician is not subject to prosecution for an induced abortion performed in a hospital or appropriate clinical setting upon a woman in her first trimester of pregnancy, our review of the record herein convinces us that defendant Nixon does not come within this exception. The testimony of the complainant indicates that Dr. Nixon performed the abortion on her with little or no consultation as to the state of her health, either mental or physical. The abortion was performed in defendant's office and was performed in a manner which, in the

opinion of doctors who testified, was improper and conducive to inducing an infection.[18] Since defendant Nixon failed to comply with the standard of care expected of members of the medical profession, he may not use his professional status as a shield. Accordingly, he was properly charged, tried, and convicted of the felony of abortion contrary to MCLA 750.14, *supra.*

Although not raised in this appeal, we feel it is incumbent to mention the burden of proof problem discussed in *People v Bricker,* 42 Mich App 352 (1972). While the last sentence of the statute impermissibly shifts the burden of proof, the record herein clearly indicates that complainant was in good health at the time she secured the abortion, and secured the abortion only because she was unmarried and unwilling to get married or have the child out of wedlock. The prosecution thus carried its burden of proof.

So that there will be no mistake as to the intent and scope of this opinion, let us briefly delineate the scope of our holding.

1. The statute is not vague in the constitutional sense. See *People v Bricker, supra.*

2. In view of the current state of medical knowledge and in light of the fact the Michigan "abortion" statute creates an anomalous result by permitting the woman to abort but denying her the opportunity to secure proper medical care, the intended purpose of the statute is no longer served by continued application of the statute to thera-

[18] Defendant Nixon took the stand in his own defense. Defendant denied performing the abortion and asserted that he only treated complainant for a vaginal discharge. It is interesting to note that defendant indicated that the technique, which complainant asserted was used by defendant, was not a proper and safe way to induce an abortion. Thus, by defendant's own words, if an abortion was performed upon complainant in the manner she described, it was not in conformance with the requisite professional standard of care.

peutic abortions performed in the first trimester of pregnancy by a licensed physician in a hospital environment.[19] We therefore hold that a licensed physician who performs a therapeutic abortion upon a woman who is in her first trimester of pregnancy, if such operation takes place in a hospital, is not subject to prosecution under MCLA 750.14, *supra*.[20]

3. The last sentence of the statute is clearly

[19] We limit the inapplicability of the statute to those therapeutic abortions performed during the first trimester and in a hospital because the data before us as to the relative safety of such an operation refer to that time period and set of circumstances. We believe that any additional determination of the relative safety of therapeutic abortions between the end of the first trimester and the point of quickening is best left to the legislative branch of government, or, in the absence of such a determination, should be determined on the facts of the individual case. In other words, until and unless the legislative branch speaks, if a licensed physician, who performs a therapeutic abortion in a licensed hospital upon a woman who is beyond her first trimester of pregnancy but before the fetus has quickened, can show that said operation involved no significant increase in danger over an operation performed during the first trimester, he too would not be subject to the application of the statute. By the same token, if the abortion is performed in a clinical setting which provided the same standard of care as a hospital and involved no significant increase in danger over a hospital operation, the doctor performing the abortion would not be subject to the statute.

[20] Since a physician who performs an abortion in accordance with this opinion is not criminally liable for such action, it also follows that he will not be subject to prosecution for manslaughter under this statute. This is not to say that a physician who is grossly negligent in performing such an operation cannot be prosecuted for manslaughter (just as he might if he negligently caused the death of any patient); however, a physician who undertakes to perform a therapeutic abortion should not be held to be liable to criminal prosecution for the death of a patient which was not the result of negligent care. To place absolute criminal liability upon a physician for the death of his patient would be so inhibitory as to countervail the basic expectations of society as to the nature and duties of the physician.

This is not to be construed to mean that the license to practice medicine is an absolute bar to prosecution. When a physician, like defendant herein, undertakes to perform an abortion in a manner so repugnant to the very standard of professional care he is bound to uphold, the intended purpose of the statute of protecting the health of the woman is thereby invoked and the physician may be properly prosecuted under MCLA 750.14, *supra.*

unconstitutional in that it impermissibly shifts the burden of proof to the defendant. Said sentence is void and of no effect, and the prosecution must prove the lack of necessity in every abortion prosecution.

Because we find that it was not the intention of the Legislature in enacting the precursor to MCLA 750.14, *supra,* thereby to protect the continued existence of an unquickened fetus or thereby to give the unquickened fetus any "right" to continued existence, we need not, and most emphatically do not, express any opinion as to whether the woman's "right of privacy" precludes any state action with regard to abortion if the Legislature chooses to recognize the unquickened fetus as a new and separate human being.

For the reasons stated herein, defendant's conviction is affirmed.

DANHOF, P. J., concurred.

T. M. BURNS, J. *(concurring in result, dissenting in part).* I concur in the majority's affirmance of defendant's conviction. I dissent from the majority's holding that the Michigan abortion statute, MCLA 750.14; MSA 28.204, has been rendered unconstitutional by virtue of improved surgical conditions and techniques.

For at least a decade, not only in Michigan, but, indeed, throughout the entire nation, the issues of abortion reform and the constitutionality of various abortion statutes have been a battleground of contentious opinion, legal, sociological, medical, political and theological. Argument and discussion of this emotionally charged issue has produced little more than invective and epithet. Not even the slightest modicum of consensus has been achieved among legislatures, lawyers, or jurists.

The nation's appellate judiciary has, for the most part, chosen to decide appeals from convictions of abortion on other than constitutional grounds.

Because of the gravity of the issue with which we are confronted and the danger of intrusion into the legislative function, we should approach the question of the constitutionality of MCLA 750.14; MSA 28.204, with extreme caution. *Carman v Secretary of State,* 26 Mich App 403 (1970); *O'Connor v Eckhardt,* 23 Mich App 150 (1970).

I am, therefore, unable to join the majority in holding the abortion statute unconstitutional upon the simplistic reasoning advanced in Judge VAN VALKENBURG's opinion. The reasoning of the majority, when reduced to its essentials, is: (1) the predecessor of the existing statute was enacted in 1846 for the purpose of protecting the health and safety of the pregnant woman; (2) medical science has made great strides since 1846 and abortions are no longer so dangerous as at the time of the enactment of the original statute, and therefore, the state has insufficient interest to justify continued application of the statute; (3) *ergo,* the Michigan abortion statute is unconstitutional.

I assume that the holding of unconstitutionality refers to the United States Constitution. The majority has failed to point out the provision thereof which, in their opinion, would be violated by continued application of the statute. This is, of itself, sufficient to debilitate the majority opinion for, as was said by the United States Supreme Court in *Pine Grove Twp v Talcott,* 86 US (19 Wall) 666; 22 L Ed 227 (1874), a court in declaring an act unconstitutional must specify the exact clause of the constitution which is violated; or as was said by our Supreme Court in *Bowerman v Sheehan,* 242 Mich 95 (1928):

"The true test, then, seems to be, that, to declare a statute unconstitutional, 'we should be able to lay our finger on the part of the Constitution violated, and that the infraction should be clear, and free from a reasonable doubt.' "

I am unable to determine, either from express language or by inference, the constitutional provision held by the majority to have been violated by the law in question.

Returning to the discussion of the majority's reasoning, I cannot agree that the abortion statute has been rendered unconstitutional by a change in the conditions existing in 1846 which impelled the Legislature to enact the law or that the law ceases to exist because the reason for its enactment has ceased to exist. This rule of *cessante ratione legis, cessat et ipsa lex* was widely used in English common law, but has had very limited acceptance in American jurisprudence. It has never been accepted in Michigan. Further, it is a rule of *stare decisis* and has no application to statutory law. Clearly, it cannot be used as a vehicle by which this Court may invalidate a statute.

It appears that the first premise in the majority's reasoning is that the predecessor statute was enacted in 1846 for the protection of the health and safety of the pregnant woman. This premise is without basis in fact. It is no doubt true, as stated by the majority, that abortions were more dangerous in 1846 than they are at the present time.

However, in 1846, in a world which knew of neither anaesthesia nor antisepsis, all surgery, no matter how minor, was extremely hazardous. Surgeons were often ill-educated and at times were almost brutal with their patients. They possessed no effective means of allaying pain. The nature and treatment of shock had not yet been explored.

Blood transfusions were mere experiments. Pathology, the science upon which the modern surgeon relies so heavily, was in its early stages of development. The conditions under which they worked would today be considered impossible. Instruments were primitive in design and few in number. The lighting by which the surgeon of 1846 worked would now be considered totally inadequate. Nonetheless, surgeons during this period were freely performing cranial, thoracic, and abdominal surgery without the slightest legislative interference.[1]

During this same period, the perils of childbirth were worsened by the spread of puerperal fever, a highly contagious infection which attacks the womb after childbirth when its interior is, so to say, a large raw wound. No effective means of disinfection against the disease were found until 1847, the year after the enactment of the predecessor statute. It can safely be said that in 1846 the hazards of childbirth were greater than those of abortion.

In view of the conditions existing at the time, how then can it be concluded by the majority that the Legislature enacted a statute prohibiting abortion, one of the less dangerous surgical operations, solely for the protection of the health and safety of the mother? It appears clear that the Legislature was not prompted solely by solicitude for the health and safety of the pregnant woman, but rather that the underlying reasons for enacting the 1846 statute were moral, ethical, philosophical and theological in nature.

No case law can be found on this question and modern writings on the subject are slanted according to the views and philosophies of the writers.

---

[1] Cartwright, *Development of Modern Surgery* (Thomas W. Crowell, 1968), Chapter 1.

The only objective and impartial treatise bearing on the reason for the enactment of abortion statutes is found in 1 Encyclopedia Britannica (1970 ed), Abortion, p 43, where it is said:

"Whether and to what extent induced abortions should be permitted, encouraged, or severely repressed is a social issue which has divided theologians, philosophers, and legislators since the dawn of Western civilization. Abortion (as well as infanticide) was apparently a common and socially accepted method of family limitation in the Greco-Roman world. Although Christian theologians early and vehemently condemned abortion, the application of severe criminal sanctions to deter its practice became common only in the 19th century. In English-speaking countries, abortion was typically outlawed absolutely except when necessary to preserve the life of the mother. As has often been the case with efforts to influence personal mores and sexual behaviour through the use of the criminal law, however, such restrictive sanctions were relatively ineffective; a significant segment of the population subject to the criminal prohibitions refused to recognize their propriety; abortion continued to be common despite its illegality and despite occasional prosecution and conviction of a small number of its practitioners."

\*   \*   \*

"Those who object to permissive abortion are motivated by religious or ethical concerns. Although Roman Catholic doctrinal discussion of the issue frequently focused on the metaphysical problem of the fetus' ensoulment, 20th-century Catholic scholars have defended an absolute prohibition of abortion by emphasizing the same humanistic and ethical concerns about murder which have motivated nonreligious opponents of abortion: 'The most fundamental question involved in the long history of thought on abortion is: How do you determine the humanity of a being? To phrase the question that way is to put in comprehensive humanistic terms what the theologians either dealt with as an explicitly theological question under the heading of "ensoulment" or dealt with implicitly in their treat-

ment of abortion.' (J. Noonan, 'Abortion and the Catholic Church; a Summary History,' *Natural Law Forum* 85, 125 [1967]). Those who object to abortion on ethical grounds begin with the premise that all modern societies would condemn (and punish) infanticide; they then contend that, except where the mother's life is at stake, there is no rational basis for distinguishing between the newborn infant and the fetus: the fetus grows, changes, and even reacts to its environment in the mother's womb; the infant is in every sense only a potential member of society, just as the fetus is."

As I have previously said, I do not believe that a statute may be held to be unconstitutional merely because there has been a change in the conditions which impelled its enactment. However, even if the act were passed for the protection of the health and welfare of the mother, and the medical arts have improved to the point where this is no longer sufficient to justify the continued application of the statute, it still may not be held invalid for that reason. It is clear that the statute was enacted at least primarily, if not wholly, for moral, ethical, theological and philosophical reasons. Considering the maelstrom of controversy in which the abortion issue is now immersed, it cannot be said that these reasons for the original enactment of the law no longer exist.

In *Ver Hoven Woodward Chevrolet, Inc v Dunkirk,* 351 Mich 190 (1958), the Court set forth the rigid test which must be applied in determining the constitutionality of a statute:

" 'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity. A statute is presumed to be constitutional and *it will not be declared unconstitutional*

*unless clearly so, or so beyond a reasonable doubt.' "*
(Emphasis supplied.)

Even the most cursory examination of the majority opinion indicates that it has not been shown therein that MCLA 750.14; MSA 28.204, is unconstitutional "beyond a reasonable doubt".

In *In re Vickers,* 371 Mich 114 (1963), the Court held that the statute does not permit the prosecution of a woman upon whom an abortion has been committed. The majority cites this case in support of their proposition that the abortion statute was enacted for the purpose of protecting the health and safety of the pregnant woman. It is clear, however, that the legislative purpose was more pragmatic and less altrustic than is claimed by the majority. It must be admitted that in virtually all prosecutions for abortion, the sole or principal witness is the woman upon whom the abortion has been committed. Obviously, if the woman were made subject to prosecution under the act, it would be impossible to convict most abortionists in cases where the woman was also prosecuted and chose to exercise her privilege against self-incrimination.

Upon a close examination of the majority opinion, I note that one sentence contains a statement that the state interest is counterbalanced and offset by the superior right of the woman and her physician to undertake such medical treatment as is deemed appropriate. It is inconceivable to me that it was the intention of the majority to so blithely dispose of a question of such magnitude and complexity. It appears to me that this statement was no more than an afterthought and that it was not the intention of the majority to decide this central issue of the entire abortion contro-

versy in a portion of one sentence. For this reason, I have no further comment.

I concur only in the affirmance of defendant's conviction.