DOE v DIRECTOR OF THE DEPARTMENT OF SOCIAL SERVICES

Docket No. 116069. Submitted February 6, 1990, at Detroit. Decided February 19, 1991, at 9:50 A.M. Leave to appeal sought.

Jane Doe, a minor indigent eligible for medical assistance payments under the state's Medicaid program, became pregnant as a result of being raped. Her mother, Nancy Doe, who also was eligible for Medicaid assistance, sought assistance to pay for an abortion for her daughter. The Department of Social Services refused assistance on the basis of the exclusion of § 109a of the Social Welfare Act, MCL 400.109a; MSA 16.490(19a), of abortion from those medical services which may be provided to a welfare recipient at public expense unless the abortion is necessary to save the life of the mother. Jane and Nancy Doe subsequently brought an action in the Wayne Circuit Court against the Director of the Department of Social Services and the Director of the Medical Services Administration of the Department of Social Services, seeking to enjoin enforcement of § 109a and a declaration that § 109a violates the Due Process, Equal Protection, and Antidiscrimination Clauses of the Michigan Constitution. The trial court, John H. Hausner, J., granted summary disposition for the defendants, finding that § 109a does not violate the Michigan Constitution. The plaintiffs appealed.

The Court of Appeals held:

Because the state has failed to show a compelling interest to justify the impingement on the right of a woman to terminate her first-trimester pregnancy, the exclusion under § 109a from the Medicaid program of indigent pregnant women who elect to have medically necessary abortions in lieu of carrying the pregnancy to term is a denial of equal protection of the law as guaranteed by the Michigan Constitution.

1. The Michigan Constitution affords women the right to an abortion. That right is balanced against the established inter-

REFERENCES

Am Jur 2d, Abortion § 1.5; Welfare Laws § 72.6.

Validity of state statutes and regulations limiting or restricting public funding for abortions sought by indigent women. 20 ALR4th 1166.

ests of the state in protecting the health both of pregnant women and of viable unborn children.

2. The Equal Protection Clause of the Michigan Constitution provides greater protection than the Equal Protection Clause of the United States Constitution. A state court is free to read its own state constitution more broadly than the United States Supreme Court reads the United States Constitution, even where the language of the two is identical. It is clear that the Michigan Equal Protection Clause created rights broader in scope than those afforded by the Fourteenth Amendment to the United States Constitution. The rights protected under the Fourteenth Amendment already were afforded under the "equal benefit" language of the 1908 Michigan Constitution which was retained when the Equal Protection Clause was adopted in the 1963 Constitution.

3. While restrictions adopted by other states to limit Medicaid funding for abortions have been held by the United States Supreme Court not to be violative of rights guaranteed by the United States Constitution, § 109a directly impinges on a woman's state-protected right to procreative choice by precluding financial assistance to an indigent woman who decides to have a medically necessary abortion while offering her financial assistance if she chooses not to exercise that right and continue the pregnancy to term.

4. Because § 109a directly impinges on the exercise of a fundamental right protected by the Michigan Constitution, the legislation can stand only if the state can show a compelling interest. No such interest has been shown in this case. While a state may impose reasonable procedural conditions as a prerequisite to receiving benefits under a statutorily created program, the state may not impose substantive conditions which burden the exercise of a constitutional right.

5. The conclusion that § 109a is violative of the Equal Protection Clause of the Michigan Constitution is not undermined by the fact that § 109a was adopted through the initiative process. Although the provisions of a statute adopted through the initiative process may be an expression of public policy, the meaning and effect of a provision of the constitution is not changed by such an expression of public sentiment.

6. The question presented does not turn on the morality or immorality of abortion or on the wisdom of the legislation; nor does the question turn on whether the state is generally obligated to subsidize the exercise of constitutional rights for those who cannot otherwise afford to do so. Rather, the narrow question is whether the state, having enacted a general pro-

gram to provide services to the poor, may selectively withhold those benefits from otherwise qualified persons solely because of the exercise of the constitutional right of procreative choice.

Reversed and remanded.

SULLIVAN, P.J., dissenting, stated that there is no reason in this case to construe the Equal Protection Clause of the Michigan Constitution more broadly than the Equal Protection Clause of the United States Constitution. The United States Supreme Court has held that state limitations on the funding of abortions for Medicaid recipients neither impinges on the right of procreative choice nor denies indigent women of equal protection of law. While § 109a operates to encourage childbirth, such encouragement by the state is permitted. Because § 109a impinges on no fundamental right and involves no suspect classification, the rational basis test, rather than the strict scrutiny test, should be applied. There exist rational reasons for paying childbirth expenses while refusing to pay for abortions not required to save the mother's life. The circuit court's order of summary disposition should be affirmed.

CONSTITUTIONAL LAW — EQUAL PROTECTION — ABORTION — MEDICAID.

The prohibition of the use of Medicaid funds for any abortion not necessary to save the life of the mother violates the Equal Protection Clause of the Michigan Constitution; the denying of Medicaid funds for a medically necessary abortion, while providing Medicaid funds for a pregnancy taken to term, impermissibly impinges on a woman's constitutionally protected right to procreative choice (Const 1963, art 1, § 2; MCL 400.109a; MSA 16.490[19a]).

*Elizabeth Gleicher, William H. Goodman,* and *Paul J. Denenfeld,* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *John M. Konwinski* and *George M. Elworth,* Assistant Attorneys General, for the Department of Social Services.

*Dykema Gossett* (by *John B. Curcio, Richard D. McLellan,* and *Cindy M. Wilder*), for intervening defendants.

Amici Curiae

*William J. Coughlin, Clarke D. Forsythe,* and *Kevin J. Todd,* for certain Michigan Senators and Representatives.

*James K. Robinson* and *Marietta S. Robinson,* for the Michigan Welfare Rights Organization, et al.

Before: Sullivan, P.J., and Doctoroff and J. W. Fitzgerald,* JJ.

J. W. Fitzgerald, J. Plaintiffs appeal as of right from the circuit court's order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(10), dismissing plaintiffs' complaint for injunctive and declaratory relief, and denying plaintiffs' motion for a preliminary injunction. On appeal, plaintiffs contend the trial judge erred in ruling that 1987 PA 59, MCL 400.109a; MSA 16.490(19a), did not violate their right to privacy and their rights under the Due Process, Equal Protection and Antidiscrimination Clauses of the Michigan Constitution, Const 1963, art 1, §§ 2, 17. We agree in relevant part and reverse.

## I. INTRODUCTION

According to plaintiffs' complaint, Jane Doe[1] was raped on or about January 15, 1989. At the time, she was a fifteen-year-old resident of this state. Her mother, Nancy Doe, also a Michigan resident, was unemployed, indigent, and a recipient of Aid to Families with Dependent Children. Both plaintiffs were eligible for state medical assistance payments through the State of Michigan's Medicaid

---

* Former Supreme Court justice, sitting on the Court of Appeals by assignment.

[1] Jane Doe's identity was revealed to the trial court in camera.

program, 1966 PA 321, MCL 400.105 *et seq.*; MSA
16.490(15) *et seq.*

As a result of the rape, Jane Doe became preg-
nant. On or about February 10, 1989, when Jane
Doe was in the first trimester of her pregnancy,
Nancy Doe sought medical assistance coverage for
a therapeutic abortion for her daughter for the
following reasons, as stated in the complaint:

> 5. Due to her age and her underlying medical
> condition,[2] the continuation of her pregnancy to
> term will entail substantial health risks for Plain-
> tiff Jane Doe. Additionally, due to the cruel cir-
> cumstances surrounding conception, as well as her
> age, Plaintiff is emotionally and psychologically
> unprepared to undergo a term pregnancy and
> delivery.
> 6. Although not necessary to save her life, a first
> trimester abortion is medically necessary to pro-
> tect the physical and psychological health of Plain-
> tiff Jane Doe.

Nancy Doe was advised that the Department of
Social Services would not pay for the abortion
pursuant to MCL 400.109a; MSA 16.490(19a),
which provides:

> Notwithstanding any other provision of this act,
> an abortion shall not be a service provided with
> public funds to a recipient of welfare benefits,
> whether through a program of medical assistance,
> general assistance, or categorical assistance or
> through any other type of public aid or assistance
> program, unless the abortion is necessary to save
> the life of the mother. It is the policy of this state
> to prohibit the appropriation of public funds for
> the purpose of providing an abortion to a person

---

[2] According to Dr. Ethelene Jones, an obstetrician-gynecologist who
examined her on February 25, 1989, Jane Doe suffers from an
unevaluated and undiagnosed seizure disorder.

who receives welfare benefits unless the abortion is necessary to save the life of the mother.

As a result of the DSS' refusal, on February 23, 1989, Jane and Nancy Doe filed a complaint against defendants, Patrick Babcock, Director of the DSS, and Kevin Seitz, Director of Medical Services Administration of the DSS, seeking entry both of preliminary and permanent injunctions enjoining the enforcement of § 109a and of a declaratory judgment that § 109a violates the Equal Protection and Due Process Clauses of Const 1963, art 1, §§ 2, 17 respectively, as well as the right to privacy guaranteed under Const 1963, art 1, § 23. Several organizations and individuals were allowed to intervene as parties defendant. On March 10, 1989, defendants moved for summary disposition pursuant to MCR 2.116(C)(8) and (10) on the grounds that plaintiffs had failed to state a claim on which relief could be granted and that there was no genuine issue of material fact regarding the constitutionality of § 109a. On March 17, 1989, the trial court granted defendants' motion pursuant to MCR 2.116(C)(10), finding that § 109a prohibited state Medicaid funding of Jane Doe's requested abortion and that § 109a was not violative of the Michigan Constitution. The court denied plaintiffs' motion for a preliminary injunction and dismissed their lawsuit.

## II. MICHIGAN'S PARTICIPATION IN THE MEDICAID PROGRAM

Title XIX of the federal Social Security Act, as amended, 42 USC 1396 *et seq.*, established the Medicaid program, jointly funded by the federal and participating state governments, to enable a state to furnish medical assistance to certain cate-

gories of needy persons, if the state chooses to do so. With the enactment of 1966 PA 321, Michigan became a participant in title XIX's medical assistance program. As a participant in the program, the state may pay only for services which the DSS considers medically necessary under 42 CFR 440.230. *Reed v Hurley Medical Center,* 153 Mich App 71, 76; 395 NW2d 12 (1986). Moreover, the director of the DSS must ensure that reimbursement is made only for "medically appropriate services," and that the state pays only for services that are "needed or appropriate." MCL 400.111a(3) (b), (4)(b); MSA 16.490(21a)(3)(b), (4)(b). See *Reed, supra.* Even certain types of cosmetic procedures are funded, provided that the attending physician certifies the reasonable medical necessity for the particular procedure. On the other hand, the availability of federal funds for particular medical care does not require the state to pay for it. See *Anderson v Director, Dep't of Social Services (After Remand),* 101 Mich App 488; 300 NW2d 921 (1980). Thus, fiscal restraints may play a legitimate role in the state's decision making with respect to Medicaid coverage. *Id.* at 495.

### III. MICHIGAN ABORTION LAW BEFORE AND AFTER *ROE v WADE*

When Michigan became a medical assistance program participant, three years after the Constitution of 1963 was adopted, neither the federal Social Security Act nor 1966 PA 321 contained an express provision concerning assistance for abortions, whether elective or therapeutic, under the program. *Stopczynski v Governor,* 92 Mich App 191, 194; 285 NW2d 62 (1979). At that time, the performing or procuring of all elective and some therapeutic abortions was a felony in this state.

MCL 750.14, 750.15, 750.322, 750.323; MSA 28.204, 28.205, 28.554, 28.555; MCL 338.53; MSA 14.533; *Stopczynski, supra.*

In 1972, a panel of this Court considered the constitutionality of one of Michigan's abortion statutes, MCL 750.14; MSA 28.204, in two cases, one involving a licensed physician, *People v Nixon,* 42 Mich App 332; 201 NW2d 635 (1972), remanded 389 Mich 809 (1973), rev'd on remand 50 Mich App 38; 212 NW2d 797 (1973), and the other involving an unlicensed abortion practitioner, *People v Bricker,* 42 Mich App 352; 201 NW2d 647 (1972), aff'd 389 Mich 524; 208 NW2d 172 (1973). After discussing the nature and history of the statute, the Court in *Nixon, supra* at 335-337, concluded that the statute was not intended to protect the rights of the unquickened[3] fetus, but rather was intended to protect the pregnant woman, having been enacted at a time before the advent of antiseptic surgery. Acknowledging the great advancement of medical science, the Court noted that not only were therapeutic abortions reasonably safe, but also it was safer for a woman to have a first-trimester therapeutic abortion than to bear the child. *Id.* at 339. Concluding that the intended purpose of MCL 750.14; MSA 28.204 no longer existed as it applied to licensed physicians in a proper medical setting, the Court explained:

> There is no longer a sufficient state interest to justify continued prosecution of licensed physicians for the mere act of artificially inducing a miscarriage of an unquickened fetus. What state interest there is in the continued protection of the woman

---

[3] "Quickening" is the point at which the fetus indicates signs of life by fetal movements, which can be felt by the mother and which are first noted in the fourth or fifth month of pregnancy. An "unquickened" fetus has not yet reached that point of intrauteral development. Stedman, *Medical Dictionary* (21st ed, 1966), pp 1340-1341.

is counterbalanced and offset by the superior right
of the woman and her physician to undertake such
medical treatment as is deemed appropriate. The
question of whether any given woman should be
given a therapeutic abortion during the first tri-
mester is a question which is properly addressed to
the discretion of the physician in the exercise of
his professional duties.

Not only has the present Michigan abortion
statute become unproductive of the end for which
it was originally intended, *i.e.*, the health and
safety of the woman, but it would appear that it
has become counter-productive. Since *In re Vick-
ers,* 371 Mich 114 [123 NW2d 253] (1963), recog-
nized that the woman could not be prosecuted
under the present statute for either a self-induced
abortion or as an aider and abettor in an abortion
performed upon her, the law has, at least to some
extent, indicated that the woman has a right to
abort. To recognize the woman's right to abort and
simultaneously deny her the right to seek proper
medical aid, except where necessary to preserve
her life, does not encourage and promote the
health and safety of the woman; but rather, it
encourages the woman to place herself in the
hands of those not properly skilled. Such an anom-
aly is not only illogical, but also is fatal to the
continued application of the statute. See *Beecham
v Leahy,* 130 Vt 164; 287 A2d 836 (1972). [*Id.* at
339-341.]

Of particular interest here is the Court's acknowl-
edgment of the woman's right to possess and con-
trol her body:

There can be no question as to the right of the
woman to possess and control her body as she sees
fit, in the absence of an expressed compelling state
interest, for as the Court stated in *Union Pacific R
Co v Botsford,* 141 US 250, 251; 11 S Ct 1000, 1001;
35 L Ed 734, 737 (1891):
"No right is held more sacred, or is more care-

fully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

See, also, *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The Court in *Griswold v Connecticut,* 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965) recognized this right of personal privacy to be constitutionally protected, and, as such, one which could not be encroached upon to any significant extent in the absence of some compelling state interest. [*Id.* at 340, n 17.]

Although the Court held that a licensed physician was not subject to prosecution for performing an induced, first-trimester abortion in a hospital or appropriate clinical setting, the Court affirmed the defendant's conviction under the statute, because he had performed the abortion on the complainant with little or no consultation regarding her state of health and in his office under conditions conducive to inducing infection. *Id.* at 341-342.

In *Bricker, supra* at 354, the same panel concluded that the abortion statute was a valid exercise of the state's power as it applied to persons not licensed to practice medicine in Michigan, because

the state's interest in making medical care by an unlicensed person a criminal act is sufficient to overcome any assertion that the woman has the "right" to seek such medical care (if "medical care" is the appropriate term for the type of unskilled butchery so often practiced by these persons) from anyone she so desires.

The Court of Appeals reasoning in *Nixon* foreshadowed by mere months the United States Supreme Court's decisions in *Roe v Wade,* 410 US

113; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den
410 US 959 (1973), and *Doe v Bolton,* 410 US 179;
93 S Ct 739; 35 L Ed 2d 201 (1973), reh den 410 US
959 (1973). In *Roe, supra* at 152-153, the Court
concluded that the right of privacy under the
United States Constitution included, as a funda-
mental right, a woman's decision to terminate her
pregnancy. However, that right is not absolute,
and must bow to the state's interests in the protec-
tion of health, medical standards, and prenatal
life, when those interests become paramount. *Id.*
at 153-155. As Justice Blackmun, writing for the
majority, explained:

> [T]he State does have an important and legiti-
> mate interest in preserving and protecting the
> health of the pregnant woman, whether she be a
> resident of the State or a nonresident who seeks
> medical consultation and treatment there, and
> that it has still *another* important and legitimate
> interest in protecting the potentiality of human
> life. These interests are separate and distinct.
> Each grows in substantiality as the woman ap-
> proaches term and, at a point during pregnancy,
> each becomes "compelling." [*Id.* at 162-163.]

According to *Roe, supra* at 163, the state's inter-
est in the health of the mother becomes compel-
ling when, "in the light of present medical knowl-
edge," the abortion procedure becomes a health- or
life-threatening one. The state's interest in the
protection of potential life becomes compelling
when the fetus has developed the capacity for
meaningful life outside of its mother's womb, i.e.,
at the point of "viability." *Id.* at 163-164. In con-
cluding that the Texas criminal abortion statute
under review, which excepted from criminality
only those abortions necessary to save the moth-
er's life, was violative of the Due Process Clause of

the Fourteenth Amendment, the Court weighed the competing rights and interests and determined: (1) prior to approximately the end of the first trimester of pregnancy, a woman's right to terminate her pregnancy is paramount, and thus the decision to abort must be left to the medical judgment of her attending physician; (2) subsequent to approximately the end of the first trimester, the state's interest in promoting the mother's health increases to the point where the state may regulate abortion to further that interest; and (3) subsequent to the fetus' viability, which may occur after twenty-four to twenty-eight weeks' gestation, the state's interest in promoting potential human life becomes so compelling that it may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 160, 164-165.

In *Doe v Bolton, supra* at 183, the Court considered Georgia's less restrictive criminal abortion statute. Consistent with its decision in *Roe,* the Court rejected the appellants' argument that a woman's right to terminate her pregnancy was absolute and recognized that, although the state had previously focused on the preservation of the woman's life, it had "the right to readjust its views and emphases in the light of the advanced knowledge and techniques of the day" in order to protect its interest in the preservation of fetal life. *Id.* at 189-191. The Court found requirements for approval by only certain accredited hospitals and by two independent physicians, as well as a state residency requirement, violative of the Fourteenth Amendment. *Id.* at 201.

*Bricker, supra,* and *Nixon, supra,*[4] reached our

---

[4] On remand from our Supreme Court for disposition consistent

Supreme Court shortly after *Roe v Wade* was decided. In *People v Bricker,* 389 Mich 524, 527; 208 NW2d 172 (1973), the Court acknowledged that, under the Supremacy Clause, it was bound by the United States Supreme Court decisions in *Roe v Wade* and *Doe v Bolton.* Although the Court acknowledged that Michigan's criminal abortion statute could not stand under the principles enunciated in *Roe* and *Doe,* the question before it was whether Michigan's Penal Code proscribed the conduct of a person not licensed as a physician, notwithstanding *Roe* and *Doe. Bricker, supra.* The Court noted that *Roe* and *Doe* did not purport to construe Michigan's abortion statutes and pointed out that it was "duty bound under the Michigan Constitution to preserve the laws of this state and to that end to construe them if we can so that they conform to Federal *and* state constitutional requirements." (Emphasis added.) *Bricker, supra* at 528. The Court recognized that the Legislature adopted the statutes prohibiting most abortions when there was little or no reason to question their constitutionality, and well in advance of the medical developments which influenced the decisions in *Roe* and *Doe. Bricker, supra* at 529. The Court also confirmed that the central purpose of the abortion statutes was clear: "to prohibit all abortions except those required to preserve the *health* of the mother." (Emphasis added.) *Id.* Thus, although the Court avoided a direct confrontation with the issue resolved by the Court of Appeals by construing *Roe v Wade* as delimiting the Michigan, as well as the federal, constitutional rights

with its decisions in *Larkin v Wayne Prosecutor,* 389 Mich 533; 208 NW2d 176 (1973), and *Bricker,* the Court of Appeals in *People v Nixon (On Remand),* 50 Mich App 38, 39-40; 212 NW2d 797 (1975), reversed its initial decision affirming the defendant doctor's conviction, because he had performed the abortion within the first trimester of pregnancy.

involved, the Court agreed with central points on which the Court of Appeals had based its decision.

In *Larkin v Wayne Prosecutor,* 389 Mich 533; 208 NW2d 176 (1973), decided on the same day as *Bricker,* our Supreme Court recognized the state's interest in protecting the life of an unborn, viable child. After finding the criminal abortion statutes, MCL 750.15, 750.322; MSA 28.205, 28.554, constitutional notwithstanding *Roe* and *Doe,* the Court considered the effect of those decisions on MCL 750.323; MSA 28.555, which provides:

> Any person who shall administer to any woman pregnant with a quick child any medicine, drug or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, shall, in case the death of such child or of such mother be thereby produced, be guilty of manslaughter.

The Court considered the import of the statute's purpose in designating its violation as manslaughter:

> [Manslaughter] is a serious crime both at common law and under our statutes because manslaughter involves the destruction of viable human life.
>
> There can be no manslaughter of an inanimate object. Neither can manslaughter be predicated upon the destruction of any form of animal life which is not human.
>
> It follows that statutes proscribing manslaughter by abortion are designed to protect human life and carry the necessary implication that that life, the destruction of which is punishable as manslaughter, is human life. [*Larkin, supra* at 540.]

By using the term "quick child" in MCL 750.323;

MSA 28.555, the Legislature intended to protect the life of a child discernibly moving in utero. *Id.* at 541. The Court defined "child," as used in MCL 750.322 and 750.323; MSA 28.554 and 28.555, as

> a viable child in the womb of its mother; that is, an unborn child whose heart is beating, who is experiencing electronically measurable brain waves, who is discernably moving, and who is so far developed and matured as to be capable of surviving the trauma of birth with the aid of the usual medical care and facilities available in the community. [*Id.* at 541-542.]

Leaving the issue of viability as a question of fact for determination in each prosecution under those statutes,[5] the Court stated:

> By reason of *Roe v Wade,* we are compelled to rule that as a matter of Federal constitutional law, a fetus is conclusively presumed not to be viable within the first trimester of pregnancy. [*Id.* at 542.]

IV. THE MICHIGAN CONSTITUTION AFFORDS WOMEN A RIGHT TO ABORTION, AND MICHIGAN HAS ESTABLISHED INTERESTS IN PROTECTING THE HEALTH BOTH OF PREGNANT WOMEN AND OF VIABLE UNBORN CHILDREN

Our review of Michigan statutes and case law concerning abortion leads us to conclude that our state has a strong, long-established interest in protecting the lives and health of its pregnant women, both through the criminalization of abor-

[5] Reaching a similar conclusion in a different context, the Court of Appeals in *Toth v Goree,* 65 Mich App 296, 304; 237 NW2d 297 (1975), concluded that a three-month-old fetus not born alive was not a person within the meaning of the wrongful death act, MCL 600.2922; MSA 27A.2922.

tions which undermine that interest and through the regulation of the members of the medical profession who perform abortions. The state also has an expressed interest in protecting the lives and health of viable, unborn children. These interests are consistent with Const 1963, art 4, § 51, which provides:

> The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health.

We also conclude that our constitution affords a right to an abortion. The United States Supreme Court in *Roe v Wade* recognized that the right to an abortion was one of those rights within constitutionally protected "zones of privacy," emanating from specific constitutional guarantees. *Id.* at 152. As Justice Blackmun noted, the Court or individual justices had found at least the origins of the right to personal privacy in the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, as well as in the "penumbras" of the Bill of Rights, see *Griswold v Connecticut,* 381 US 479, 484-485; 85 S Ct 1678; 14 L Ed 2d 510 (1965).

Our own Supreme Court acknowledged that right under the United States Constitution and also found it to be a right under the Michigan Constitution:

> This Court has long recognized privacy to be a highly valued right. *De May v Roberts,* 46 Mich 160; 9 NW 146 (1881). No one has seriously challenged the existence of a right to privacy in the Michigan Constitution nor does anyone suggest that right to be of any less breadth than the guarantees of the United States Constitution.

The United States Supreme Court has recognized the presence of constitutionally protected "zones of privacy." *Griswold v Connecticut,* 381 US 479, 484; 85 S Ct 1678; 14 L Ed 2d 510 (1965); *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973). These zones have been described as being within "penumbras" emanating from specific constitutional guarantees. Often mentioned as a basis of the right to privacy are the 1st, 3rd, 4th, 5th, 9th and 14th Amendments to the United States Constitution. The people of this state have adopted corresponding provisions in art 1 of our Constitution. [*Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 504-505; 242 NW2d 3 (1976).]

*Roe v Wade* provided an analytical framework within which a woman's fundamental right to an abortion, the state's interest in protecting the lives and health of its women, and the state's interest in protecting the lives and health of its viable, unborn children could be afforded protection commensurate with their weight and significance at a given stage of pregnancy. That weight and significance may change with advances in our understanding of such matters as the point at which a fetus becomes viable, the importance of the mother's physical and mental health to the development of the fetus, and the association between the mother's mental health and her physical health. We also recognize that, while the rights and interests involved may be competing in some situations, they may also be in accord in others. Thus, in addressing plaintiffs' claims, our concerns include Jane Doe's right[6] to choose the medical treatment

[6] We express no opinion regarding the necessity of Nancy Doe's involvement in her daughter's decision to seek an abortion. We merely note that, to the extent this case involves a minor female, she had the approval of her parent to undergo an abortion, thus entitling her to effectuate her choice of medical care. See *Hodgson v Minnesota,* 497 US —; 110 S Ct 2926; 111 L Ed 2d 344 (1990).

of abortion, the state's interest in her life and health in the third week of her pregnancy, and the state's interest in the life and health of a non-"viable" fetus.

### V. SECTION 109a VIOLATES THE EQUAL PROTECTION CLAUSE OF THE MICHIGAN CONSTITUTION

We consider plaintiffs' claim that § 109a violates Michigan's Equal Protection Clause dispositive in this case.

Const 1963, art 1, § 2 provides:

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The Legislature shall implement this section by appropriate legislation.

As the United States Supreme Court has acknowledged, and we find equally true under our state constitution, the Equal Protection Clause, like the Due Process Clause, "is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated." *Louisville Gas & Electric Co v Coleman,* 277 US 32, 37; 48 S Ct 423; 72 L Ed 770 (1928). Although the "equal protection" provision of our constitution is not a clause with precise definition, we recognize it can be violated by legislation that either affects a fundamental interest, as in this case, or creates a suspect classification, and that cannot be justified by any compelling interest of the state. *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975). In a case that does not

involve a fundamental interest or a suspect class, a determination whether the legislation violates the Equal Protection Clause is made under the rational basis test, which requires that the party challenging the statute show it is without reasonable justification. *Id.*

The circuit court held that Const 1963, art 1, § 2 is no broader in scope than the Equal Protection Clause of the Fourteenth Amendment and, applying the rational basis test, concluded that § 109a did not violate that provision. For several reasons, we reach a contrary conclusion.

## A. MICHIGAN'S EQUAL PROTECTION CLAUSE PROVIDES GREATER PROTECTION THAN THE FEDERAL EQUAL PROTECTION CLAUSE.

A state court is free to read its own state's constitution more broadly than the United States Supreme Court reads the federal constitution, or to reject the mode of analysis used by the United States Supreme Court in favor of a different analysis of the state's corresponding constitutional guarantee. *City of Mesquite v Aladdin's Castle, Inc,* 455 US 283, 293; 102 S Ct 1070; 71 L Ed 2d 152 (1982); *PruneYard Shopping Center v Robins,* 447 US 74, 81; 100 S Ct 2035; 64 L Ed 2d 741 (1980). See also *People v Thompson,* 424 Mich 118, 125; 379 NW2d 49 (1985). As the Supreme Court of Hawaii explained in *State v Kaluna,* 55 Hawaii 361, 369, n 6; 520 P2d 51 (1974):

> While this results in a divergence of meaning between words which are the same in both the federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is *greater* protection of individual rights under state law than under federal law.

The Bill of Rights, major portions of which are made applicable to the states by virtue of the Fourteenth Amendment, is derived from state constitutional provisions which predate the adoption of the federal constitution. As the court said in *People v Brisendine,* 13 Cal 3d 528, 550; 119 Cal Rptr 315; 531 P2d 1099 (1975):

> It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse. "By the end of the Revolutionary period, the concept of a Bill of Rights had been fully developed in the American system. Eleven of the 13 states (and Vermont as well) had enacted Constitutions to fill in the political gap caused by the overthrow of British authority. . . . [¶] . . . Eight of the Revolutionary Constitutions were prefaced by Bills of Rights, while four contained guarantees of many of the most important individual rights in the body of their texts. Included in these Revolutionary constitutional provisions were *all of the rights that were to be protected in the federal Bill of Rights.* By the time of the Treaty of Paris (1783) then, the American inventory of individual rights had been virtually completed and included in the different state Constitutions whether in separate Bills of Rights or the organic texts themselves." (Italics added.) (1 Schwartz, The Bill of Rights: A Documentary History (1971) p 383; see generally 2 *id.,* p 1204.) . . .

We need not further extend this opinion to trace to their remote origins the historical roots of state constitutional provisions. Yet we have no doubt that such inquiry would confirm our view of the matter. The federal Constitution was designed to guard the states as sovereignties against potential abuses of centralized government; state charters, however, were conceived as the first and at one

time the only line of protection of the individual against the excesses of local officials.

Furthermore, we are not breaking new ground in asserting that a provision of our state constitution which is, in relevant part, phraseologically indistinguishable from its federal counterpart, should be construed more broadly than the United States Supreme Court considers appropriate for federal jurisprudential purposes. See *Delta Charter Twp v Dinolfo,* 419 Mich 253, 276-277, n 7; 351 NW2d 831 (1984) (zoning ordinance limiting occupation of residential property); *People v Jackson,* 391 Mich 323, 337-338; 217 NW2d 22 (1974) (right to counsel at photographic identification); *People v White,* 390 Mich 245; 212 NW2d 222 (1973) (constitutionality of same transaction test under Double Jeopardy Clause); *People v DenUyl,* 318 Mich 645, 650-651; 29 NW2d 284 (1947) (scope of privilege against self-incrimination); *People v Victor,* 287 Mich 506, 514; 283 NW 666 (1939) (constitutionality of prohibition on giving premiums with sale of gas). See also *People v Neumayer,* 405 Mich 341, 363, n 16; 275 NW2d 230 (1979). The Michigan Supreme Court has even accorded a more liberal construction to a facially narrower provision of the state constitution. *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975), cert den 423 US 878 (1975). Thus, the provisions of the Michigan Constitution may compel a different result, independent of any of the provisions of the federal constitution.

It is a fundamental principle of statutory construction, which generally applies to the construction of the constitution, see *Detroit Bd of Ed v Superintendent of Public Instruction,* 319 Mich 436; 29 NW2d 902 (1947); *Council 23, AFSCME v Wayne Co Civil Service Comm,* 32 Mich App 243; 188 NW2d 206 (1971), that every word should be

given meaning, and no word should be treated as surplusage or rendered nugatory if at all possible. *State Bar of Michigan v Galloway,* 422 Mich 188; 369 NW2d 839 (1985); *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728; 330 NW2d 346 (1982); *Swift v Kent Co,* 171 Mich App 390; 429 NW2d 605 (1988). Application of this principle to the Equal Benefit and Equal Protection Clauses of the Michigan Constitution leads us to conclude that those clauses provide greater protection than does the federal Equal Protection Clause alone.

In *Naudzius v Lahr,* 253 Mich 216, 222; 234 NW 581 (1931), a decision preceding the adoption of the Constitution of 1963 by thirty-two years, our Supreme Court stated:

> The equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution. *In re Fox's Estate,* 154 Mich 5 [117 NW 558 (1908), rev'd on other grounds 159 Mich 420; 124 NW 60 (1909).]

The Court in *Naudzius* was dealing with the Constitution of 1908, which contained no equal protection clause equivalent to Const 1963, art 1, § 2. Thus, we conclude that the Court was referring, both in *Naudzius* and in the cited case of *In re Fox Estate,* to Const 1908, art 2, § 1, which provided:

> All political power is inherent in the people. Government is instituted for their equal benefit, security and protection.

It follows that our Supreme Court considered the "equal benefit" language of that section to import the equal protection principles of the Fourteenth

Amendment into Michigan jurisprudence. The
"equal benefit" provision of the Constitution of
1908 has been carried forward, with no change in
language, and is now Const 1963, art 1, § 1.

It would violate basic precepts of constitutional
adjudication, as it would under similar circum-
stances breach the doctrines of statutory construc-
tion, to treat the equal protection language of
Const 1963, art 1, § 2 as adding nothing to those
rights of the people already afforded by the Equal
Benefit Clause of Const 1963, art 1, § 1 and its
predecessor, Const 1908, art 2, § 1. This is particu-
larly true because, at the time of the adoption of
the Constitution of 1963, the equivalence of the
"Equal Benefit" Clause to the Equal Protection
Clause of the Fourteenth Amendment had long
been recognized and established. In addition, the
convention comment to Const 1963, art 1, § 2
clearly stated, "This is a new section."

Furthermore, in cases of doubtful construction
of the provisions of the constitution, we may look
to the debates of the Constitutional Convention for
guidance. *Union Steam Pump Sales Co v Secretary
of State,* 216 Mich 261; 185 NW 353 (1921). In
submitting Committee Proposal 26 to the Commit-
tee of the Whole on February 1, 1962 (which
became Const 1963, art 1, § 2), the Chairman of
the Committee on Declaration of Rights, Suffrage
and Elections noted:

> [T]here has been a distinct trend in recent State
> Constitutions to incorporate equal protection or
> civil rights clauses *to apply to all persons* as well
> as those singled out for special attention because
> of more apparent discrimination. . . . In short, the
> incorporation of civil rights provisions is in accord
> with the contemporary trend in state constitution
> writing. [Emphasis supplied. 1 Official Record, Con-
> stitutional Convention 1961, p 740.]

Thus, the convention advocated the adoption of an equal protection clause, not simply parroting the equivalent provisions of the Fourteenth Amendment but creating rights broader in scope than those afforded under its federal counterpart. To hold otherwise would render the Equal Protection Clause surplusage and duplicative of the Equal Benefit Clause of art 1, § 1, and it would negate the avowed intention of the convention to recognize the historical role of state constitutional provisions as both distinct from and more all-encompassing than their federal counterparts, even when the phraseology may be equivalent or identical.

Relying upon *Moore v Spangler,* 401 Mich 360; 258 NW2d 34 (1977), *Fox v Employment Security Comm,* 379 Mich 579, 588; 153 NW2d 644 (1967), and *Doster v Estes,* 126 Mich App 497, 512; 337 NW2d 549 (1983), the circuit court reached the contrary conclusion advanced by defendants on appeal that Michigan's Equal Protection Clause is coextensive with that of the federal constitution. In *Moore, supra* at 368-370, the plaintiff argued that she had been denied her right to equal protection of the law by the circuit court's refusal to allow oral argument on her appeal from the district court, in the face of GCR 1963, 819.1, which guaranteed a right of oral argument to parties appealing from circuit court to the Court of Appeals. In rejecting the plaintiff's claim, our Supreme Court merely quoted from *Naudzius,* 253 Mich 222, that " '[t]he equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution.' " *Moore, supra* at 370. In *Fox, supra* at 585, the plaintiff contended that the unreasonable classification of persons applying for unemployment compensation benefits under the Em-

ployment Security Act denied him equal protection of the laws. In finding that the challenged classification violated equal protection, our Supreme Court stated:

> This Court has held numerous times that the Michigan Const 1908, art 2, § 1, secures the same right of equal protection as does its counterpart in the Constitution of the United States. *Gauthier v Campbell, Wyant & Cannon Foundry Company,* 360 Mich 510, 514 [104 NW2d 182 (1960)], and cases therein cited. The same provisions in Const 1963, art 1, §§ 1 and 2, must likewise be held to afford the same rights as the Federal equal protection clause. [*Id.* at 588.]

In *Doster, supra* at 512, a panel of this Court simply relied upon *Fox* for the proposition that the same rights were afforded by both the Michigan and federal Equal Protection Clauses.

We are not persuaded that our Supreme Court's statement in *Fox* requires us to alter our conclusion that Michigan's Equal Protection Clause provides more protection than that of the United States Constitution. In the context of the facts and issues of that case, the Court saw no need to construe Const 1963, art 1, § 2 more broadly than the Fourteenth Amendment's Equal Protection Clause. There was no suggestion that, under certain circumstances, Const 1963, art 1, § 2 could not be construed more expansively than its Fourteenth Amendment counterpart. Moreover, neither in *Fox* nor in *Moore* did the Court consider the expansive effect the enactment of the Constitution of 1963, with the addition of art 1, § 2, had on the scope of protection already afforded by the equal benefits provision. We cannot conclude that, by its bare statement in *Fox,* our Supreme Court intended to relinquish the freedom of our state courts, under

all circumstances, to read our state's Equal Protection Clause more broadly than the federal Equal Protection Clause.

### B. MICHIGAN COURTS ARE FREE TO ANALYZE STATE CONSTITUTIONAL PROVISIONS DIFFERENTLY THAN FEDERAL COURTS ANALYZE FEDERAL CONSTITUTIONAL PROVISIONS.

Beyond our freedom to read our own state's Equal Protection Clause more broadly than that of the United States Constitution, we are also free to reject the method used by the United States Supreme Court in analyzing the federal Equal Protection Clause in favor of a different analysis of Michigan's Equal Protection Clause. See *Aladdin's Castle, Inc,* 455 US 293.

> The United States Supreme Court does not have a monopoly on correct constitutional interpretation. This fact is a cornerstone of federalism, justifying substantive disagreement by state courts. Although factors such as textual differences between the federal and state constitutions can certainly contribute to a state court's reasoning, the presence of these factors should not be viewed as a necessary condition precedent to independent analysis, under state constitutions, of claims rejected by the United States Supreme Court.
>
> *       *       *
>
> A state court may certainly be justified in declining requested relief in a suit raising state constitutional challenges. Such a result, however, should be based upon state constitutional analysis and not upon misplaced reliance upon Supreme Court federal constitutional interpretations. The latter approach constitutes an unwarranted delegation of state power to the Supreme Court and a resultant abdication of state judicial responsibility. By the same token, state court dissenters remain

free to criticize the majority's reasoning and result, but they should not blindly advocate allegiance to Supreme Court interpretations of a different Constitution. [Williams, *In the Supreme Court's Shadow: Legitimacy of State Rejection of Supreme Court Reasoning and Result,* 35 SC L R 353, 402-404 (1984).]

As our Supreme Court pointed out in *Delta Charter Twp v Dinolfo,* 419 Mich 276-277, n 7, in which the Court rejected the United States Supreme Court's conclusion in *Village of Belle Terre v Boraas,* 416 US 1; 94 S Ct 1536; 39 L Ed 2d 797 (1974):

In *People v Victor,* 287 Mich 506; 28 NW 666 (1939), we found a statute prohibiting the giving away of drinking glasses at gas stations to be unreasonable and arbitrary and in violation of the Due Process Clause of the Michigan Constitution, despite that in *Rast v Van Deman & Lewis Co,* 240 US 342; 36 S Ct 370; 60 L Ed 679 (1916), the United States Supreme Court had upheld a similar law which banned the giving away of trading stamps. We applied the same rationality test, but we reached a different conclusion. We did not there and we do not now hesitate to reach a conclusion different from that reached by the United States Supreme Court when it is warranted.

For the benefit of the parties to this case and for any future review, we offer the following "plain statement." As should be clear from our outright rejection of *Belle Terre,* our decision here is based solely on the Due Process Clause of the Michigan Constitution, art 1, § 17, notwithstanding the use of a standard originally developed in the federal system.

See also *People v Smith,* 420 Mich 1, 7, n 2; 360 NW2d 841 (1984).

C. THE FEDERAL EQUAL PROTECTION CLAUSE IS NOT
VIOLATED BY STATE REGULATIONS LIMITING MEDICAID
FUNDING FOR ABORTIONS.

The approach of the United States Supreme Court in determining the extent of federal constitutional protection of privacy rights in the context of Medicaid funding restrictions became apparent only a few years after *Roe v Wade* was decided. The United States Supreme Court considered whether the United States Constitution required a state participating in the title XIX Medicaid program to pay for nontherapeutic abortions when it pays the costs of childbirth.[7] *Maher v Roe,* 432 US 464; 97 S Ct 2376; 53 L Ed 2d 484 (1977). In that case, indigent women of Connecticut claimed that their state was required to afford equal treatment to both abortion and childbirth and was not allowed to express a policy preference by funding only those medical expenses incident to childbirth. *Id.* at 470. After finding that no discrimination against a suspect class was involved, the Court considered whether the regulation impinged upon the fundamental right to abortion, which it recognized as protecting "the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Id.* at 473-474. The Court concluded that the Connecticut regulation did not impinge upon that fundamental right, reasoning:

> The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a

---

[7] Title XIX of the Social Security Act does not itself require a participating state to fund nontherapeutic abortions as a condition of its participation. *Beal v Doe,* 432 US 438, 444-445; 97 S Ct 2366; 53 L Ed 2d 464 (1977).

consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation. We conclude that the Connecticut regulation does not impinge upon the fundamental right recognized in *Roe*. [*Id.* at 474.]

Applying the rational basis test, the Court recognized that the state's strong and legitimate interest in encouraging normal childbirth was rationally furthered by the funding limitation; therefore, it did not violate the Equal Protection Clause of the federal constitution. *Id.* at 478-479.

Subsequently, in *Harris v McRae,* 448 US 297; 100 S Ct 2671; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980), a majority of the Supreme Court relied extensively on its reasoning and decision in *Maher, supra,* in holding that the Hyde Amendment, which limited federal funds to only certain medically necessary abortions,[8] did not impinge on the "due process liberty recognized in *Wade*" and did not violate the equal protection component of the Fifth Amendment. *Harris, supra* at 318, 322.

On the same day *Harris* was decided, the Supreme Court upheld a state statute prohibiting

---

[8] The Hyde Amendment restricted Medicaid funding for abortions to those where the mother's life would be endangered if the fetus was carried to term and where necessary for the victims of promptly reported rape or incest. Different versions of the Hyde Amendment were applicable for fiscal year 1977 (no rape or incest exception) and for most of fiscal year 1978 and all of fiscal year 1979 (additional exception for abortions where two physicians determined that severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term). *Harris,* 448 US 302-303.

state medical assistance payments for all abortions not necessary to preserve the life of the woman seeking an abortion. *Williams v Zbaraz*, 448 US 358; 100 S Ct 2694; 65 L Ed 2d 831 (1980), reh den 448 US 917 (1980). The Court relied on its majority decision in *Harris* and held that the statute did not violate the Equal Protection Clause of the Fourteenth Amendment.[9]

### D. SECTION 109a DIRECTLY IMPINGES UPON A FUNDAMENTAL RIGHT UNDER THE MICHIGAN CONSTITUTION.

Clearly, if the issues presented were to be adjudicated under the federal constitution, whether under the Equal Protection or Due Process Clauses

[9] The United States Supreme Court continued to rely on its reasoning in *Maher v Roe, supra,* to justify its finding in *Webster v Reproductive Health Services,* 492 US —; 109 S Ct 3040, 3050-3054; 106 L Ed 2d 410 (1989), that the limits on public assistance in the performance of abortions imposed by a Missouri statute were constitutional. As discussed below at 523-525, we reject the Supreme Court's reasoning in *Maher v Roe,* as we do that in *Webster.* An additional issue raised by the parties in *Webster* was the constitutionality of the statute's provision requiring a physician to ascertain before performing an abortion that the fetus of a woman, who the physician believed was twenty or more weeks pregnant, was not viable. 109 S Ct 3047. While a majority of the Court found that that provision did not violate the United States Constitution, only three justices suggested that *Roe v Wade* and succeeding cases were modified and narrowed by its opinion, 109 S Ct 3058 (Rehnquist, C.J., joined by White and Kennedy, JJ.), with Justice Scalia expressing dismay that the opinion did not explicitly overrule *Roe v Wade.* 109 S Ct 3064 (Scalia, J., concurring in part and concurring in judgment). A majority of the justices agreed that the viability determination provision in the Missouri statute did not offend *Roe v Wade* as it stands. 109 S Ct 3060 (O'Connor, J., concurring in part and concurring in judgment), 109 S Ct 3069-3071 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and dissenting in part), 109 S Ct 3079 (Stevens, J., concurring in part and dissenting in part). Beyond the majority's affirmation of *Roe v Wade,* we note that Missouri's viability determination provision required a determination of the viability of a fetus twenty weeks old or more. In this case, § 109a prohibited plaintiffs from terminating Jane's pregnancy approximately three weeks after conception. Thus, the viability provision considered in *Webster* has little resemblance to the statute at issue here.

of the Fourteenth Amendment, or some "right of
privacy" extracted from the First, Third, Fourth,
or Ninth Amendments, plaintiffs' challenges to the
constitutional validity of MCL 400.109a; MSA
16.490(19a) would be rejected. However, the ques-
tion before us concerns provisions of our state
constitution, which we are free to read more
broadly and analyze differently than those of the
federal constitution. See *Aladdin's Castle, Inc,* 455
US 293. With that established, we consider
whether, under the circumstances of this case,
§ 109a impinges on a pregnant woman's funda-
mental right to an abortion under the Michigan
Constitution. Contrary to both the circuit court's
ruling and the decisions of the United States
Supreme Court in *Maher* and *Harris,* we conclude
that it does.

A pregnant woman in this state has a funda-
mental right to procreative choice, which includes
the right to an abortion as well as the corollary
fundamental right to bear her child. Before the
enactment of § 109a, all Michigan women, rich and
poor alike, were able to exercise those fundamen-
tal rights. Those indigent pregnant women who
met the financial resource limitations set for the
Medicaid program were able to obtain the medi-
cally necessary care recommended by their physi-
cians, including abortion, throughout their preg-
nancies. Consistent with this state's long-estab-
lished interest in the health of its pregnant
women, the state made such care available, not
without regard to the woman's financial status,
but because of her indigency, which was a require-
ment for her receipt of Medicaid funding for her
pregnancy.

Plaintiffs are indigent women, otherwise quali-
fied to receive the benefits of the Medicaid pro-
gram. The effect of the adoption of § 109a was to

impinge on Jane Doe's right to choose to terminate her pregnancy. If such a Medicaid-qualified pregnant woman exercises her fundamental right to bear her child, the state must, by statute, provide funding for her medically necessary care during her pregnancy. However, if such a woman chooses to have an abortion, even where medically necessary or required to terminate a pregnancy resulting from rape or incest, § 109a directly prevents the state from providing funds for that care. It is the woman's exercise of one fundamental right— the right to an abortion—which triggers § 109a's restrictions. Her right to bear the child is not similarly impinged upon.

We recognize that, while the woman's indigency also acts as a barrier to her freedom of choice, the state is not required to remedy that condition. But the state itself, by adoption of § 109a, has created a direct barrier to the woman's exercise of her right to an abortion.

There is thus an inequality within the program, with the distinction based on an indigent pregnant woman's exercise of an option which the constitution vouchsafes to her individually. If she exercises her constitutional right to abortion, she is excluded from a program for which she is otherwise qualified; if she elects not to exercise that constitutional option, she may continue to receive the benefits of this statutory program.

Fundamentally, indigent pregnant women are burdened in the exercise of their constitutional right of procreative choice, because they are the only people unable to obtain the "medically necessary" therapeutic service of abortion under the Medicaid program. This inequality is exacerbated on the facts of this case, where Jane Doe became pregnant as a result of rape, a criminal act. The indigent victim of a mugging who suffers another

type of physical injury is not prevented from obtaining necessary medical treatment for the injury through the Medicaid program. But because Jane Doe chose to exercise her constitutional right to terminate her pregnancy, the state denied her the funds for that medically necessary treatment. That denial results in a curious public policy which necessitates a crime victim's carrying of a rapist's child to term, and then either mothering that child through its minority, quite probably at state expense, or making the child available for adoption.

### E. ABSENT A COMPELLING STATE INTEREST, § 109a IS UNCONSTITUTIONAL.

(1) Having concluded that § 109a directly impinges upon a fundamental right under the Michigan Constitution, we consider whether that infringement renders the statute unconstitutional. As our Supreme Court has acknowledged:

> The right to privacy includes certain activities which are fundamental to our concept of ordered liberty. Rights of this magnitude can only be abridged by governmental action where there exists a "compelling state interest." *Roe, supra,* 152, 155. *Kropf v Sterling Heights,* 391 Mich 139, 157-158; 215 NW2d 179 (1974). [*Advisory Opinion 1975 PA 227,* 396 Mich 505.]

Therefore, we apply the strict scrutiny test, under which the state is required to show a compelling interest which justifies its legislative action. *Manistee Bank & Trust Co,* 394 Mich 668.

Defendants describe the goals of § 109a as the protection of potential human life and the encouragement of normal childbirth. Defendants admit, as it cannot be denied, that fiscal restraints do not

play a role in the restriction of funding for abortions under § 109a. The costs for an abortion, particularly at an early stage of pregnancy, are much less than the costs for childbirth. In addition, once the child is born into an indigent family, the state funds much of the costs associated with promoting the child's welfare. Thus, it is clear that § 109a's restrictions are not cost effective, but increase the state's financial burden to some extent.

The state's interest in protecting human life must be measured by considering the degree to which the human life at issue has potentiality. *Larkin,* 389 Mich 541-542. The likelihood that a human life will result from a fetus depends on various factors, including the genetic viability of the fetus, the changing health status of the mother and the growing fetus, and circumstances outside of the mother's womb. The protection of potential human life is not a compelling state interest, which may constitutionally impinge upon a woman's right to an abortion, before the fetus is a "child," or constitutes viable human life, as defined by our Supreme Court in *Larkin.*

We recognize that, when the state creates a right that did not exist at common law, such as the Medicaid program, it may impose reasonable procedural conditions as a prerequisite to the benefits of the program. *Grand Rapids Independent Publishing Co v Grand Rapids,* 335 Mich 620; 56 NW2d 403 (1953); *Finkelstein v Dep't of Revenue,* 312 Mich 186; 20 NW2d 154 (1945). It is said that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a [person] in the position of [appellants] must take the bitter with the sweet." *Arnett v Kennedy,* 416 US 134, 153-154; 94 S Ct 1633; 40 L Ed 2d 15 (1974), reh den 417 US 977 (1974).

However, unconstitutional substantive conditions may not be imposed. In many areas, the Michigan judiciary has declared that burdening the exercise of a constitutionally protected right, *People v Snow,* 386 Mich 586, 593; 194 NW2d 314 (1972); *People v Earegood,* 383 Mich 82, 85; 173 NW2d 205 (1970); *People v Guest,* 47 Mich App 500, 502-503; 209 NW2d 601 (1973); *People v Courts,* 401 Mich 57, 61; 257 NW2d 101 (1977); *In re Van Zant,* 126 Mich App 732, 736; 338 NW2d 1 (1983), or offering an inducement for waiver of a constitutional right, *People v Pallister,* 14 Mich App 139, 148-149; 165 NW2d 319 (1968), is constitutionally intolerable. Conceptually, the same principle applies here.

(2) Our conclusion that § 109a is violative of the Michigan Constitution is not undermined by the fact that the statute in question was adopted through the initiative process, Const 1963, art 2, § 9. The legislative power of the people, through the initiative and referendum, does not give any more force or effect to voter-approved legislation than to other legislative acts, which are "on an equal footing." *Advisory Opinion on Constitutionality of 1982 PA 47,* 418 Mich 49, 66; 340 NW2d 817 (1983), quoting *Luker v Curtis,* 64 Idaho 703, 706-707; 136 P2d 978, 979 (1943). Although we recognize that the provisions of such a statute may be an expression of public policy, a constitutional provision does not mean one thing when it is adopted and another thing subsequently, when public sentiment has changed. *Walber v Wayne Circuit Judge,* 2 Mich App 145; 138 NW2d 772 (1966), aff'd 381 Mich 138; 160 NW2d 876 (1968). The meaning of the constitutional provision in question is immutable, in the sense that its meaning does not change merely because a majority of the electorate, a transitory group, voted to adopt

MCL 400.109a; MSA 16.490(19a). As our Supreme Court has explained, in determining the meaning of a constitutional provision:

> [W]e should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time; for, if we are successful in doing this, we have solved the question of its meaning for all time. It could not mean one thing at the time of its adoption, and another thing today, when public sentiments have undergone a change. *McPherson v Secretary of State,* 92 Mich 377 (16 L R A 475, 31 Am St Rep 587 [52 NW 469 (1892)]). It is therefore essential that we determine the intent of this provision by reference to the state of the law or custom previously existing, and by the contemporaneous construction, rather than attempt to test its meaning by the so-called advanced or liberal views obtaining among a large class of the community at the present day. [*Pfeiffer v Detroit Bd of Ed,* 118 Mich 560, 564; 77 NW 250 (1898); see also *Burdick v Secretary of State,* 373 Mich 578, 584; 130 NW2d 380 (1964).]

We also recognize that our conclusion appears inconsistent with the following remarks by our Supreme Court in *Bricker,* 389 Mich 529:

> The public policy of this state is to be found in the declarations and deeds of its people. These find concrete expression in the constitution adopted by the people, the laws enacted by the Legislature, the acts of the Governor, the Attorney General, others exercising executive power, the decisions of our courts, and the vote of the people. Proponents of abortion reform took a case to the people last November and lost.
>
> It is the public policy of the state to proscribe abortion. This public policy must now be subordinated to Federal Constitutional requirements.

However, we are not bound by such dicta. See *Whitehead & Kales Co v Taan,* 233 Mich 597, 601; 208 NW 148 (1926); *Berger v Weber,* 82 Mich App 199, 213; 267 NW2d 124 (1978), aff'd as modified 411 Mich 1; 303 NW2d 424 (1981). Moreover, the Court did not appear to consider either that the public policy of the state, as expressed by statute, would also be subordinated to state constitutional requirements, see *Campbell v Detroit,* 51 Mich App 34, 37; 214 NW2d 337 (1973), or that the reason underlying the state's prohibition of abortion—protecting the health of the mother—did not necessarily conflict with the dictates of *Roe v Wade.*

(3) In concluding that the state's interest is not a compelling one, we have found persuasive reported decisions in which five other states considered the validity of statutes or administrative regulations with language similar to, but less restrictive than, § 109a, under their respective state constitutions, and found them unconstitutional. See *Doe v Maher,* 40 Conn Sup 394; 515 A2d 134 (1986); *Planned Parenthood Ass'n v Dep't of Human Resources,* 630 Or App 41; 663 P2d 1247 (1983), aff'd 297 Or 562; 687 P2d 785 (1984); *Right to Choose v Byrne,* 91 NJ 287; 450 A2d 925 (1982); *Committee to Defend Reproductive Rights v Myers,* 29 Cal 3d 252; 172 Cal Rptr 866; 625 P2d 779; 20 ALR4th 1118 (1981); *Moe v Secretary of Administration & Finance,* 382 Mass 629; 417 NE2d 387 (1981).

In *Right to Choose v Byrne, supra* at 293, the Supreme Court of New Jersey concluded that its state statute prohibiting Medicaid funding for abortions "except where it is medically indicated to be necessary to preserve the woman's life," violated the right of pregnant women to equal protection of the law under the New Jersey Constitution. Acknowledging that there is no fundamen-

tal right to funding for an abortion, the court
reasoned:

> The right to choose whether to have an abortion,
> however, is a fundamental right of all pregnant
> women, including those entitled to Medicaid reim-
> bursement for necessary medical treatment. As to
> that group of women, the challenged statute dis-
> criminates between those for whom medical care is
> necessary for childbirth and those for whom an
> abortion is medically necessary. Under NJSA
> 30:4D-6.1, those needing abortions receive funds
> only when their lives are at stake. By granting
> funds when life is at risk, but withholding them
> when health is endangered, the statute denies
> equal protection to those women entitled to neces-
> sary medical services under Medicaid.
>
> Thus, the statute impinges upon the fundamen-
> tal right of a woman to control her body and
> destiny. [*Id.* at 305-306.]

The court explained that, although the protection
of potential life is a legitimate state interest, it did
not outweigh, at any stage of the pregnancy, the
superior interest in the life and health of the
mother. *Id.* at 306. Conceding that the legislature
was not required to fund any of the costs of
medically necessary treatment for an indigent
woman's pregnancy, the court concluded, as do we:

> Once it undertakes to fund medically necessary
> care attendant upon pregnancy, however, govern-
> ment must proceed in a neutral manner. Given
> the high priority accorded in this State to the
> rights of privacy and health, it is not neutral to
> fund services medically necessary for childbirth
> while refusing to fund medically necessary abor-
> tions. Nor is it neutral to provide one woman with
> the means to protect her life at the expense of a
> fetus and to force another woman to sacrifice her
> health to protect a potential life. [*Id.* at 306-307.]

See also *Committee to Defend Reproductive Rights, supra.*

Similarly, the Connecticut Supreme Court responded in *Doe v Maher* to the United States Supreme Court's decision in *Maher v Roe* by ruling that its state regulation restricting Medicaid funding for abortions constituted a violation of substantive due process because the regulation impinged upon the plaintiffs' right of privacy guaranteed by the state constitution. As the Connecticut Supreme Court explained, once the state chose to pay for medical treatment of the poor, it was required to do so with neutrality. *Doe v Maher.* Because no compelling reason to justify the regulation was advanced by the state, the regulation was unconstitutional. *Id.* Moreover, the regulation constituted a violation of the equal protection clauses of the Connecticut Constitution, which had been amended by addition of an equal rights amendment.

We conclude that the Connecticut Supreme Court's due process analysis is supportive of our equal protection analysis. In addition, although Michigan has not adopted an equal rights amendment, we have recognized the broader scope of our own Equal Protection Clause, as compared to that of the federal constitution.

(4) The circuit court in this case placed great reliance upon the only contrary state case, *Fischer v Dep't of Public Welfare,* 509 Pa 293; 502 A2d 114 (1985), in which the Supreme Court of Pennsylvania rejected attacks on the basis of the equal rights provisions of that state's constitution, art 1, § 1 and art 3, § 32, the antidiscrimination provision of art 1, § 26, and the equal rights amendment of art 1, § 28. However, for several reasons, we find that case unpersuasive.

A basic premise of the *Fischer* decision is that

Medicaid funding restrictions on abortion do not concern the fundamental right to an abortion. As discussed above, we reject that premise. Plaintiffs' claim is that § 109a impinges upon the fundamental right to an abortion. Rather than reword the issue to achieve a particular result, we address it as stated. Simply because Jane Doe's inability to pay for an abortion was the first barrier to her exercise of her right to procreative choice, it does not follow that it is the only direct barrier. Clearly, she was qualified for Medicaid funding because of her inability to pay such costs, and § 109a acted as a second, direct, state-imposed barrier to her exercise of a fundamental right.

Additionally, the Pennsylvania statute contained an exception not found in MCL 400.109a; MSA 16.490(19a), namely, that public funds could be used for abortion services for indigent women not only when the life of the mother was endangered, but also in cases of rape or incest. It is these exceptions which buttress the *Fischer* Court's opinion, and underlie its *ratio decidendi*:

> In the present case, however, we cannot accept appellant's rather simplistic argument that because only a woman can have an abortion then the statute necessarily utilizes "sex as a basis for distinction," *Henderson v Henderson, supra* [458 Pa 97, 101; 327 A2d 60 (1974)]. To the contrary, the basis for the distinction here is not sex but abortion, and the statute does not accord varying benefits to men and women because of their sex, but accords varying benefits to one class of women, as distinct from another, *based on a voluntary choice made by the women.* [509 Pa 313-314. Emphasis supplied.]

Yet the case at bar is a perfect example of a highly relevant distinction between this case and

*Fischer.* Plaintiff Jane Doe is a fifteen-year-old, unemancipated, unmarried pregnant female. Beyond her claims that she was forcibly raped, because of her youth Jane Doe's ability to lawfully consent to sexual activity is not unfettered. MCL 750.520c(1)(b); MSA 28.788(3)(1)(b). Her condition cannot be said to be "voluntary" because the statute contains no exceptions for victims of incest or rape and no exceptions for those whose mental impairments may cast doubt upon their ability to become pregnant through a conscious process that involves an element of "voluntariness." Under Michigan's jurisprudential scheme, the law has a "tender regard" for the insane, the mentally incompetent, the aged, and the infirm, or any others who may be under a disability. *Brydges v Home for the Aged,* 373 Mich 408; 129 NW2d 869 (1964). Contrary to the circuit court's opinion in this case, *Fischer* does not preclude a contrary outcome as applied to the facts of this case.

We add that this case should not, and for us does not, present a moral question. As the court said in *Committee to Defend Reproductive Rights v Myers, supra,* 29 Cal 3d 256-257:

> First, this case does not turn on the morality or immorality of abortion, and most decidedly does not concern the personal views of the individual justices as to the wisdom of the legislation itself or the ethical considerations involved in a woman's individual decision whether or not to bear a child. Indeed, although in this instance the Legislature has adopted restrictions which discriminate against women who choose to have an abortion, similar constitutional issues would arise if the Legislature—as a population control measure, for example—funded Medi-Cal abortions but refused to provide comparable medical care for poor women who choose childbirth. Thus, the constitutional question before us does not involve a weigh-

ing of the value of abortion as against childbirth,
but instead concerns the protection of either pro-
creative choice from discriminatory governmental
treatment.

Second, contrary to the suggestion of the defen-
dants and the dissent, the question presented is
not whether the state is generally obligated to
subsidize the exercise of constitutional rights for
those who cannot otherwise afford to do so; plain-
tiffs do not contend that the state would be re-
quired to fund abortions for poor women if the
state had not chosen to fund medical services for
poor women who choose to bear a child. Rather,
we face the much narrower question of whether
the state, having enacted a general program to
provide medical services to the poor, may selec-
tively withhold such benefits from otherwise quali-
fied persons solely because such persons seek to
exercise their constitutional right of procreative
choice in a manner which the state does not favor
and does not wish to support.

## VI. CONCLUSION

Because the state has failed to show a compel-
ling interest to justify § 109a's impingement on the
right of a woman to terminate her first-trimester
pregnancy, we hold that exclusion from the Medi-
caid program of indigent pregnant women who
elect "medically necessary" abortions in lieu of
carrying the pregnancy to term is a denial of equal
protection of the law guaranteed by Const 1963,
art 1, § 2. In so declaring, we note that the federal
authorities on which defendants have relied do not
address situations where state-funded abortion ser-
vices for rape or incest victims, inter alia, are
being withheld.

Our resolution of this appeal on the basis of the
Equal Protection Clause of Const 1963, art 1, § 2,
makes it unnecessary to address the other consti-

tutional arguments advanced by plaintiffs involving the Due Process Clause of Const 1963, art 1, § 17, and the Antidiscrimination Clause of Const 1963, art 1, § 2. See *Taylor v Auditor General,* 360 Mich 146, 154; 103 NW2d 769 (1960).

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

DOCTOROFF, J., concurred.

SULLIVAN, P.J. *(dissenting).* I dissent.

The people of this state, through the legislation at issue, have spoken: "It is the policy of this state to prohibit the appropriation of public funds for the purpose of providing an abortion to a person who receives welfare benefits unless the abortion is necessary to save the life of the mother." MCL 400.109a; MSA 16.490(19a).[1]

As stated in *People v Bricker,* 389 Mich 524, 529; 208 NW2d 172 (1973):

> The public policy of this state is a mandate upon us. Our duty to enforce that mandate is as clear as is our duty to comply with decisions of the United States Supreme Court construing the Federal Constitution.
>
> The public policy of this state is to be found in the declarations and deeds of its people. These find concrete expression in the constitution adopted by the people, the laws enacted by the Legislature, the acts of the Governor, the Attorney General, others exercising executive power, the decisions of our courts, and the vote of the people.

*Bricker* was decided on the heels of *Roe v Wade,*

---

[1] The prohibition on using public funds to pay for an abortion, unless the abortion is necessary to save the life of the mother, evolved by way of an initiative petition, a referendum petition and, then, general election. Const 1963, art 2, § 9.

410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den 410 US 959 (1973). The *Bricker* Court noted that the public policy of this state to proscribe abortion "must now be subordinated to Federal Constitutional requirements" as interpreted in *Roe*, because under the Supremacy Clause the Court is bound by the *Roe* decision. *Bricker, supra,* pp 527, 529.

Given the language in *Bricker,* I see no reason in this case to construe Const 1963, art 1, § 2, more broadly than the Fourteenth Amendment's Equal Protection Clause. Moreover, our state constitution is usually held to provide the same equal protection and due process rights as the federal constitution. *Fox v Employment Security Comm,* 379 Mich 579, 588; 153 NW2d 644 (1967); *Palmer v Bloomfield Hills Bd of Ed,* 164 Mich App 573, 576; 417 NW2d 505 (1987); *Grieb v Alpine Ski Area, Inc,* 155 Mich App 484, 487; 400 NW2d 653 (1986). I therefore rely to a great extent on the United States Supreme Court decision in *Maher v Roe,* 432 US 464; 97 S Ct 2376; 53 L Ed 2d 484 (1977), in concluding that, to my belief, the legislation at issue does not violate our state constitution.

In *Maher,* a majority of the Supreme Court held that a state regulation under which Medicaid recipients received payments for medical services incident to childbirth but not for medical services incident to nontherapeutic abortions, does not violate the Equal Protection Clause of the Fourteenth Amendment. After deciding that the law at issue neither impinged on the fundamental right of a woman to decide whether to terminate a pregnancy nor discriminated against a suspect class, the majority applied the rational relationship test. *Id.,* pp 474, 478. Applying that test, it recognized that the state has a strong and legitimate interest in encouraging normal childbirth and determined

that the law at issue rationally furthered that
interest. *Id.,* p 478. Therefore, the law did not
violate the Equal Protection Clause.

A few years later, in *Harris v McRae,* 448 US
297, 318, 322; 100 S Ct 2671; 65 L Ed 2d 784
(1980), reh den 448 US 917 (1980), a majority of
the Supreme Court held that the Hyde Amend-
ment, which limited federal funds to only certain
medically necessary abortions, did not impinge on
the "due process liberty recognized in [*Roe v*]
*Wade*" and did not violate the equal protection
component of the Fifth Amendment. In reaching
its decision, the majority in *Harris* relied exten-
sively on its decision in *Maher.*

On the same day that the Court decided *Harris,*
it also upheld a state statute which prohibited
state medical assistance payments for all abortions
not necessary to preserve the life of the woman
seeking an abortion against a claim that the stat-
ute violated the Equal Protection Clause of the
Fourteenth Amendment. *Williams v Zbaraz,* 448
US 358; 100 S Ct 2694; 65 L Ed 2d 831 (1980). The
Court held that the arguments of the parties chal-
lenging the validity of the statute were foreclosed
by the majority decision in *Harris.*

My primary disagreement with the majority
opinion is over whether the legislation at issue,
§ 109a, impinges on a woman's fundamental right
to choose to have an abortion. The majority con-
cludes that it does and therefore determined
whether the legislation is justified by a compelling
state interest. I contend that it does not.

No one questions a woman's right to choose to
have an abortion without "unduly burdensome
interference." *Maher,* 432 US 473-474. I am not
persuaded, though, that the state's refusal to pay
for such a procedure impinges on the woman's

right, even if the state opts to pay medical expenses for childbirth.

The majority states: "Fundamentally, indigent pregnant women are burdened in the exercise of their constitutional right of procreative choice, because they are the only people unable to obtain the 'medically necessary' therapeutic service of abortion under the Medicaid Program." *Supra,* p 524. But nothing requires a state to pay for *any* medically necessary services. How is it, then, that § 109a is the barrier to a woman's exercise of her right to have an abortion? It is a woman's indigency itself which burdens her right. Section 109a places no obstacles in the way of a woman who chooses to have an abortion. Instead, it merely fails to remove an obstacle which is not of the state's making: the woman's indigency. See *Maher,* 432 US 474; *Harris,* 448 US 314.

There is no doubt that § 109a operates to encourage childbirth. This is permitted. A state is not precluded from favoring childbirth over abortion and from allocating public funds to favor childbirth. See *Maher,* 432 US 474. A distinction exists between a state's interfering with a protected activity and its encouraging an alternative activity. See *id.,* p 475, and, e.g., *Jacobs v Headlee,* 135 Mich App 167, 173-174; 352 NW2d 721 (1984), and *Cornwell v Dep't of Social Services,* 111 Mich App 68, 74; 315 NW2d 150 (1981). Here, the legislation encourages an alternative activity to abortion without interfering with a woman's right to have an abortion.

Nor do I believe that the classification created by the statute requires us to apply the strict scrutiny test. If the legislation at issue operated to disadvantage a suspect classification, then the Court must determine whether the classification is justified by a compelling state interest. *Manistee*

*Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975); *Grieb, supra,* p 488. First, although the statute necessarily affects only women, it does so on the basis of a biological fact unique to women: only women can get pregnant. Equal treatment therefore is not required. *People v McDonald,* 409 Mich 110, 123; 293 NW2d 588 (1980); *Fischer v Dep't of Public Welfare,* 509 Pa 293, 312-315; 502 A2d 114 (1985). Second, financial need does not constitute a suspect class. *Maher,* 432 US 470-471. Finally, the statute does not create a classification on the basis of race. Nor do plaintiffs allege that the statute, even if facially neutral, purposefully discriminates against African Americans. See, e.g., *People v Ford,* 417 Mich 66, 101-103; 331 NW2d 878 (1982), and *Doster v Estes,* 126 Mich App 497, 512; 337 NW2d 549 (1983).[2]

Because the legislation neither impinges on a fundamental right nor discriminates against a suspect classification, strict scrutiny is not appropriate. In other words, the state does not need to justify the legislation with a compelling state interest. Instead, the rational basis test is appropriate: whether the classification is rationally related to a legitimate governmental interest. *Manistee*

[2] I also am unpersuaded that the statute violates what is referred to as the "Antidiscrimination Clause" of our state constitution. Const 1963, art 1, § 2 ("nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin"). A panel of this Court recently held that an intent or purpose to discriminate need not be shown in a case brought under the Antidiscrimination Clause. *NAACP v Dearborn,* 173 Mich App 602, 615-617; 434 NW2d 444 (1988). Here, plaintiffs claim that the statute has a discriminatory effect on African Americans and, therefore, that it violates the Antidiscrimination Clause in our state constitution. However, that clause prevents discrimination in the exercise of a civil or political right. Again, though, the statute in this case does not affect a civil or political right. Instead, it affects the *funding* of abortion. Therefore, the statute does not discriminate against people in the exercise of a civil right.

*Bank & Trust Co, supra,* p 668; *Shavers v Attorney General,* 402 Mich 554, 613; 267 NW2d 72 (1978). Under this test, the party challenging the legislation must show that the classification is so arbitrary that it cannot be supported under any state of facts, either known or which could reasonably be assumed. *Automatic Music & Vending Corp v Liquor Control Comm,* 426 Mich 452, 459; 396 NW2d 204 (1986), app dis 481 US 1009 (1987); *Grieb, supra,* p 488.

Applying this test, I contend that the legislation at issue withstands scrutiny under our state constitution; the legislation bears a rational or reasonable relationship to a legitimate goal of the Legislature. *Automatic Music & Vending Corp, supra,* p 459; *Shavers, supra,* p 613. Protecting the potentiality of human life and encouraging childbirth are unquestionably strong and legitimate interests which have been repeatedly recognized by the United States Supreme Court. *Harris,* 448 US 325; *Beal v Doe,* 432 US 438; 97 S Ct 2366; 53 L Ed 2d 464 (1976). Even the Court in *Roe v Wade* recognized that there is "still *another* important and legitimate interest in protecting the potentiality of human life." 410 US 162. Paying for the medical expenses of childbirth for an indigent woman while not paying for the medical expenses of an abortion for an indigent woman creates an incentive which is rationally or reasonably related to the goal of protecting life. *Harris,* 448 US 325. Moreover, it is not irrational for the state to pay for medically necessary services generally, but not for abortions. As noted by the Supreme Court in *Harris,* "Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Id.*

Plaintiffs' remaining constitutional claims can

be easily resolved. Jane Doe further claims that the statute at issue violates the Equal Protection Clause because it is overbroad, that it violates her right to privacy, and that it violates her right to due process, Const 1963, art 1, § 17. The test used to determine a due process violation essentially is the same as the test applied above in an equal protection analysis: Whether the statute bears a reasonable relation to a permissible goal of the Legislature. See *Shavers, supra,* pp 612-613. The test for overbreadth is similar: Whether the state's grouping of all individuals into one class is rationally related to a legitimate state interest. *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 503; 242 NW2d 3 (1976). In light of my analysis above with regard to equal protection, I think it sufficient merely to state that these tests have been satisfied in this case. Nor does the statute violate a pregnant woman's right to privacy. See *Harris,* 448 US 312-318.

The statute, which precludes Medicaid funds from being used to pay for abortions unless an abortion is necessary to save the life of the mother, does not violate our state constitution. The circuit court order granting defendants' motion for summary disposition should therefore be affirmed.